UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

AMERIJET INTERNATIONAL, INC.,
a Florida corporation,

      Plaintiff,

v.

ZERO GRAVITY CORPORATION,
a Maryland corporation,

      Defendant.
_____/

## COMPLAINT

COMES NOW, Amerijet International, Inc. ("Amerijet"), Plaintiff herein, and for its Complaint respectfully alleges:

## NATURE OF THE ACTION

1. This is an action by Amerijet against Defendant Zero Gravity Corporation ("Zero G") to obtain declaratory and injunctive relief to require the Defendant to abide by its legal obligations, including without limitation its contractual obligations and the Trade Secrets law. The action also seeks damages resulting from the actions of Defendant.

## PARTIES

2. Plaintiff Amerijet is a Florida corporation with its principal place of business located at 2800 S. Andrews Ave., Fort Lauderdale, Broward County, Florida.

3. Defendant Zero Gravity is a Maryland Corporation with its principal place of business located at 4601 North Fairfax Drive, Suite 1200, Arlington, Fairfax County, Virginia. Upon information and belief, Defendant regularly conducts business in this federal district, and upon further information and belief has engaged in substantial and not isolated activity and has

1

committed tortious acts within the State of Florida and in this federal district either directly or through its agents and employees.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action under 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states. Declaratory and other relief is authorized by the Federal Declaratory Judgment Act, as amended, 28 U.S.C. §§ 2201 and 2202.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district. In addition, Plaintiff and Defendant have contractually consented to venue in the Engine Lease Agreement and Management Services Agreement between the parties, and the breach of obligations by Defendant contained in each of these Agreements is at issue in this action.[1]

## FACTUAL BACKGROUND

6. Amerijet is a U.S. all-cargo airline operating under a U.S. Department of Transportation Federal Aviation Administration ("FAA") operating certificate, certificate number PCSA059B. According to FAA operations specifications issued for Amerijet, Amerijet is authorized to operate specific aircraft for specific types of flying. Although those are primarily aircraft configured for the transportation of cargo, the FAA previously has authorized

---

[1] The Engine Lease Agreement provides in pertinent part as to "VENUE" that "All legal actions arising from this Lease shall be brought before a court of competent jurisdiction in Broward County, Florida. Both parties hereby consent to such jurisdiction and venue." The Management Services Agreement in turn provides that it "shall be governed by and construed under and in accordance with the laws of the state of Florida", and that "The parties agree that any state or Federal court located in the State of Florida shall have non-exclusive jurisdiction to hear any suit, action or proceeding arising out of or in collection with this Agreement." *See* Exhibits A and B.

Amerijet to operate the Boeing 727 aircraft with the FAA registration number (tail number) of N794AJ (the "Zero G aircraft").

### Zero G's Breach of the Management Services Agreement

7.  By agreement entered into on about November 16, 2006, Zero G contracted with Amerijet to provide certain management services for Zero G (the "Management Services Agreement", attached as Exhibit A). The services to be provided in exchange for the payments and reimbursements set forth in that Agreement, included the operation and maintenance of the Zero G aircraft in the performance of the business of Zero G.

8.  Amerijet provided services to Zero G under the Management Services Agreement for which Amerijet is entitled to payment under the terms of that Management Services Agreement, from the commencement of that Agreement until the termination of that Agreement in accordance with its provisions effective May 4, 2014.

9. Amerijet rendered services prior to the termination of the Management Services Agreement for which Amerijet is entitled to payment under that Agreement, but Zero G has failed to make such payments required by Zero G to be made. As such failure has continued unremedied for more than fifteen business days, despite Amerijet's repeated demand for payment, Amerijet brings this action for breach of the Management Services Agreement to recover such monies and other damages to which Amerijet is entitled under that Management Services Agreement.

10. The payments due from Zero G to Amerijet under the Management Services Agreement that have not been contested exceed $75,000, exclusive of interests and costs.

## Zero G's Breach of the Engine Lease Agreement

11.  Effective March 31, 2007, Plaintiff Amerijet and Defendant Zero G entered into an Engine Lease Agreement, whereby Zero G leased from Amerijet three engines for use on the Zero G aircraft (the "Engine Lease Agreement", attached as Exhibit B).

12.  The Engine Lease Agreement provided in Section 5 that at the expiration of the Engine Lease Agreement the engines "shall be returned to Lessor".

13.  After Amerijet served its 30-day notice of termination of the Management Services Agreement upon Zero G, Amerijet sought from Zero G by written notice to Zero G's General Counsel either a signed extension of the expired Engine Lease Agreement, with certain amendments which Amerijet deemed necessary to protect Amerijet from contingencies that might arise during the final 30 days of the business relationship between Amerijet and Zero G, or failing Zero G's execution of that amendment and extension of the Engine Lease Agreement, the immediate return of the engines to Amerijet.

14.  In response, Zero G's General Counsel notified Amerijet that Zero G would not sign the amendment and extension of the Engine Lease Agreement, and further stated that Amerijet had no right to the immediate possession of its engines that were on the Zero G aircraft.

15.  In accordance with Amerijet's rights under the Engine Lease Agreement, to proceed by appropriate court action or actions, at law or in equity, to enforce specific performance by Zero G of the terms of the Engine Lease Agreement – such terms specifically including the return of the engines following the termination of the Engine Lease Agreement – Amerijet brought an action on April 14, 2014 in state court in Harris County, Texas, where the engines were then located on the Zero G aircraft, for declaratory and injunctive relief to take possession of Amerijet's engines, as well as for conversion of the engines.

4

16. Only after initiating that court action, and obtaining a temporary restraining order (which Amerijet voluntarily agreed not to exercise immediately to repossess its engines, so that the parties could attempt to mediate the matter at Amerijet's urging), which was subsequently dissolved and replaced with an order maintaining the status quo (including the grounding of the Zero G aircraft) pending a hearing on Amerijet's motion, did Zero G provide Amerijet with an executed extension of the Engine Lease Agreement, extending the Engine Lease Agreement without amendment through the remainder of the term of the Management Services Agreement.

17. The Engine Lease Agreement provides that Amerijet shall be entitled to recover from Zero G any and all damages which Amerijet should sustain by reason of Zero G's breach of any of the provisions of the Engine Lease Agreement, "together with a reasonable sum for attorney's fees and such expense as may be expended or incurred in the seizure, rental, or sale of the Engines, or in the enforcement of any right or privilege hereunder, or in any judicial action (including appeals) in connection with such breach." Amerijet therefore seeks to recover in this action the reasonable sum, including attorney's fees and other reasonable costs and expenses, incurred in the enforcement of Amerijet's rights in the Texas state court action.[2]

---

[2] Zero G subsequently removed that state court action to Federal Court, and Amerijet thereafter voluntarily dismissed the action as mooted by Zero G's extension of the Engine Lease Agreement and the subsequent assurance from Zero G that Amerijet would be permitted to repossess its engines. Despite Amerijet's voluntary dismissal of that action, Zero G thereafter attempted to use the action as a vehicle to pursue other grievances relating to the maintenance records for the Zero G aircraft; in the course of responding to those grievances concerning certain maintenance records, which Zero G has represented in an updated status report filed this date with the Southern District of Texas through its counsel are no longer being sought from that court, Amerijet made mention of its own claims in the hope of obtaining an informal resolution of its grievances as well, but without success. In consequence, Amerijet now brings this action to formally assert its claims in the proper venue for doing so.

18. Following termination of the Engine Lease Agreement as extended, Zero G again failed to return the engines to Amerijet, as Zero G failed to remove the engines from the Zero G aircraft and return the engines to Amerijet's place of business.

19. Amerijet incurred costs and expenses in obtaining the return of the engines to Amerijet, relating to the removal of the engines from the Zero G aircraft and the delivery of the engines to Amerijet's place of business in Miami from the location in Georgia where Zero G elected to park the Zero G aircraft. Amerijet has demanded payment of these costs and expenses from Zero G but which Zero G has refused to pay. Therefore Amerijet seeks to recover those payments in this action in accordance with the provisions of the Engine Lease Agreement.

20. Following the termination of the Engine Lease Agreement, Amerijet continued to be deprived of the use or possession of the engines until such time as Amerijet was able to obtain the return of those engines. Amerijet seeks payment for the period that its engines remained in the possession of Zero G according to quantum meruit.

21. Finally, Zero G has not paid Amerijet the rental payment due for May of 2014 for the engines, for the period up through the termination of the Engine Lease Agreement as extended, despite repeated demand by Amerijet for such payment. Amerijet seeks to recover such payment due in this action as well.

**Zero's G's unlawful possession and use of Amerijet's Property and Intellectual Property**

22. Defendant has in its possession, custody or control confidential and trade secret information of Amerijet and which is used by Zero G and, upon information and belief, has been disclosed to third parties, including without limitation Everts Air Cargo, and has not been returned to Amerijet.

23. Amerijet has created, revised, and compiled several manuals required by the FAA and approved by the FAA for Amerijet's own operations as a Part 121 air carrier and as an operator of the Boeing 727 aircraft on the FAA operations specifications issued for Amerijet, including Amerijet's General Operations Manual ("GOM"), its General Maintenance Manual ("GMM"), and its Boeing 727 Operations Manual ("AOL").  These manuals are unique to Amerijet and have been approved as Amerijet's required manuals by the FAA.

24. Amerijet also has created, revised, and/or compiled supplements to certain of Amerijet's manuals, and associated documents such as Minimum Equipment Lists or "MELs", with respect to parabolic operations and/or otherwise unique to the Zero G aircraft, to comply with the FAA and also NASA requirements regarding the Zero G aircraft and the operation and maintenance of the Zero G aircraft.

25. The manuals, supplements, and related documents consist of information which derives independent economic value, that is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and is the subject of efforts, reasonable under the circumstances, to maintain its secrecy.

26. Amerijet's manuals, and the parabolic supplements and related documents for the Zero G aircraft developed by Amerijet, are trade secrets of Amerijet which, upon information and belief, have been misappropriated by Zero G.  Specific examples of the misappropriated trade secret documents are the General Maintenance Manual and the General Operations Manual.  Additional discovery may result in supplementation and/or amendment of this list.

27. Amerijet has restricted access to these manuals and related supplements and documents. Amerijet also has posted proprietary warnings with respect to these materials,

specifically including its GOM and GMM.  Restricting access and posting proprietary warnings have been deemed sufficiently reasonable measures to protect secrets.

28.  Amerijet did not make its information generally known by providing it to Zero G. The disclosure of a trade secret to persons with whom the plaintiff has a confidential business relationship generally does not destroy trade secret protection.

29.  Zero G has no contractual right to the use, license, or possession of Amerijet's manuals or other trade secret documents.  The Management Services Agreement contains no such contractual right or license, and represents the entire agreement between the parties with respect to its subject matter.

30.  During certain of the time period that the Management Services Agreement was in effect, the Zero G aircraft was operated for NASA to conduct aeronautical research.  NASA requires any contractor to operate and maintain such aircraft in accordance with the requirements of Title 14 CFR Part 121, together with any additional FAA requirements to meet the reduced gravity mission and NASA's aircraft safety and management requirements.

31.  Upon information and belief, Zero G is in possession of, and is attempting to utilize by passing off as Zero G's maintenance manual and/or modifications or supplements to Amerijet's maintenance manual, for purposes of meeting NASA requirements following the termination of the Management Services Agreement.

32.  Upon further information and belief, Zero G has submitted to NASA as Zero G's Operations and Maintenance Manuals, in whole or in part, Amerijet's GOM and/or GMM, or the supplements or related documentation.

33.  Upon information and belief, Zero G and/or Everts Air Cargo have attempted to pass off to the FAA and/or NASA that the manuals and programs of Amerijet are the property and

intellectual property of Zero G, in order to attempt to meet the requirements of Part 121 regarding maintenance and operation of the Zero G aircraft.

34. Amerijet has demanded the return of its manuals, including all copies and electronic copies, and has sought a representation from Zero G that neither it nor its agents is using or disclosing to third parties Amerijet's property or intellectual property, but Zero G has refused to provide such a representation and has refused to return the manuals and related intellectual property of Amerijet in Zero G's possession or control.

35. Zero G also has in its possession parts, equipment, and components belonging to Amerijet that were with the Zero G aircraft at the time of the termination of the Management Services Agreement.  Amerijet repeatedly has made demand to Zero G for the return of these parts, equipment, and components but Zero G has failed and refused to do so.

**COUNT I: DAMAGES FOR BREACH OF MANAGEMENT SERVICES AGREEMENT**

36.  Amerijet realleges and readopts the allegations contained in paragraphs 1 through 35 as if fully set forth herein.

37. This is an action against Zero G for breach of the Management Services Agreement, seeking damages in excess of $75,000.00.

38. Zero G materially breached the Management Services Agreement by failing to pay for services and other reimbursable costs and expenses under the Management Services Agreement, incurred prior to the termination of the Management Services Agreement in May of 2014.

39.  As a direct and foreseeable result of the breaches, Amerijet has incurred costs and damages, in an amount to be determined by this Court.

40. The Management Services Agreement provides that "In the event of a dispute between the parties arising out of the terms, conditions, and obligations imposed by this Agreement, the prevailing party in such dispute shall be entitled to recover reasonable attorney's fees, costs and expenses incurred in connection therewith."

WHEREFORE, Plaintiff demands judgment against Defendant for damages, interest, costs, attorney's fees, and for such other and further relief as this Court deems just and proper.

## COUNT II: DAMAGES FOR BREACH OF ENGINE LEASE AGREEMENT

41.  Amerijet realleges and readopts the allegations contained in paragraphs 1 through 40 as if fully set forth herein.

42.  This is an action against Zero G for breach of the Engine Lease Agreement, seeking damages in excess of $75,000.00

43. Zero G materially breached the Engine Lease Agreement by to pay the rent due under the Engine Lease Agreement.

44. Zero G also breached the term of the Engine Lease Agreement to return the engines upon demand at the termination of the Engine Lease Agreement, following Zero G's refusal to execute the amendment and extension provided by Amerijet to Zero G as the alternative to return of the engines, necessitating a court action to enforce Amerijet's rights in Texas State Court for which attorney's fees, costs and other expenses have reasonably been incurred by Amerijet.

45. Zero G also failed to pay the expenses incurred by Amerijet in obtaining repossession of the engines after the expiration of the Engine Lease Agreement as extended, expenses incurred in the removal and repossession of the engines following Zero G's failure to return the engines to Amerijet at Amerijet's place of business.

46.  Section 11 of the Engine Lease Agreement provides that the obligation of the Lessee to pay the rent and any additional amounts due and payable to Lessor under the Engine Lease Agreement is "absolute and unconditional."

47.  The failure to make the payments due to Amerijet under the Engine Lease Agreement constitute events of default for which Amerijet is entitled to its recovery of its reasonable attorney's fees and costs incurred in this action and other actions according to the terms of the Engine Lease Agreement.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, interest, costs, expenses, attorneys' fees, and for such other and further relief as this Court deems just and proper.

## COUNT III - CONVERSION

48.  Plaintiff realleges and incorporate paragraphs 1 through 47 above as if fully set forth herein.

49.  Defendant has wrongfully and unlawfully asserted dominion over property of Amerijet, including parts, equipment and components, and including intellectual property and other valuable confidential and proprietary information of Amerijet.

50.  Defendant's acts of dominion are inconsistent with Amerijet's ownership of the property and intellectual property.

51.  Zero G wrongfully deprived Amerijet of its right to possession of the parts, equipment and manuals after the termination of the contractual and business relationship between Amerijet and Zero G, after Zero G was notified that this property and materials were not rightfully Zero G's, and Zero G failed to return this property and materials to Amerijet.

52. Zero G converted Amerijet's parts, equipment and manuals for its own benefit when it kept the parts, equipment and manuals following the termination of the contractual and business relationship between Amerijet and Zero G, even after Zero G was informed that the parts, equipment and manuals did not rightfully belong to Zero G.

53. As a result of Defendant's wrongful conversion of the property of Amerijet, Amerijet is entitled to damages in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, permanent injunctive relief, attorney's fees, costs and expenses, interest, and such other relief as the Court may deem just and proper.

## COUNT IV – MISAPPROPRIATION OF TRADE SECRETS

54. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 53 above.

55. Manuals, manual supplements, and related documentation concerning maintenance, operation and training in connection with Amerijet's Boeing 727 aircraft and the Zero G aircraft while on the operating specifications of Amerijet, constitute trade secrets of Amerijet protected by Florida's Uniform Trade Secrets Act.

56. Amerijet has acted at all times reasonably to protect from disclosure these trade secrets.

57. By their actions Zero G and, on information and belief, its agent Everts Air Cargo, have misappropriated Amerijet's trade secrets in violation of Fla. Stat. Ch. 688.

58. As a direct and proximate result of Zero G's misappropriation of trade secrets, Amerijet has incurred damages in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendant for actual damages, unjust enrichment damages, attorney's fees, costs and such other relief, including injunctive relief, as the Court may deem just and proper.

## COUNT V - CIVIL THEFT

59.  Amerijet realleges the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

60.  This is an action by Amerijet for damages against Defendant Zero G for civil theft in violation of Fla. Stat. §§ 772.11 and 812.014.

61.  Zero G committed civil theft under Fla. Stat. § 812.014 by knowingly obtaining, retaining and using parts, equipment and components which are the property of Amerijet with the criminal intent to, either temporarily or permanently, deprive Amerijet of its right to the benefit of such parts, equipment and components, or with the intent to appropriate the parts, equipment and components for its own use, or the use of another person not entitled to such parts, equipment and components.

62.  Zero G also committed civil theft under Fla. Stat. § 812.014 by knowingly obtaining, and using Amerijet manuals and manual supplements and other confidential and trade secret information and materials which are the property of Amerijet with the criminal intent to, either temporarily or permanently, appropriate the manuals and supplements and related other confidential and trade secret information for its own use, or the use of another person or entity not entitled to such information and materials.

63.  The parts, equipment, and components, and the manuals, supplements, and other confidential and trade secret materials, rightfully belong to Amerijet, which has a possessory interest in the equipment and materials.

64. Amerijet has been damaged as to the value of the parts and equipment wrongfully obtained and kept by Zero G in violation of Fla. Stat. § 812.014(1)(a).

65. Amerijet has been damaged as to the manuals and other confidential and trade secret information to the value of which was wrongfully appropriated to Zero G's own use or the use of others not entitled to such information and materials in violation of Fla. Stat. § 812.014(1)(b).

66. Pursuant to Fla. Stat. § 772.11, Amerijet is entitled to recover threefold the actual damages sustained by reason of the theft.

67. Section 772.11 further entitles Amerijet to recover its reasonable attorneys' fees and cost incurred by reason of the theft.

WHEREFORE, Amerijet prays that this Court will enter judgment in favor of Amerijet and against Zero G, award Amerijet damages caused by the civil theft, including treble damages, attorneys' fees and costs, and prejudgment and postjudgment interest, and award such other and further relief as the Court deems just, equitable and appropriate.

## COUNT VI – QUANTUM MERUIT

68. Amerijet realleges the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

69. This is an action by Amerijet for quantum meruit, for Zero G's possession of Amerijet's engines following the expiration of the Engine Lease Agreement as extended.

70. As set forth above, Amerijet was deprived of the possession of its engines, and Zero G retained possession of Amerijet's engines, following the expiration of the Engine Lease Agreement until such time as the engines were returned to Amerijet.

71. Amerijet seeks to recover in quantum meruit the value of the engines for the period retained by Zero G following expiration of the Engine Lease Agreement, in an amount to be determined by the Court.

## PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF

WHEREFORE, Plaintiff prays:

A.      That judgment be entered declaring that the actions of the Defendant are in violation of law.

B.      That Defendant be permanently enjoined from the actions described herein consistent with the law.

C.      That Plaintiff have such other and further relief as this Court may deem just and proper.

Plaintiff further prays that the Defendant herein be duly cited to appear and answer this Complaint, after having been served with a copy of same, and that after due proceedings had, there be judgment herein in favor of Amerijet and against the Defendant granting a permanent injunction, and awarding Plaintiff's damages or other relief for such losses as may have been occasioned by the acts of Defendant.

Dated:  July 28, 2014

Respectfully submitted,

AMERIJET INTERNATIONAL, INC.
JOAN CANNY, ESQ.
Fla. Bar No. 0492531
jcanny@amerijet.com
2800 South Andrews Avenue
Fort Lauderdale, FL  33316
Telephone:     (954) 320-5367
Facsimile:      (305) 423-3246

By: _s/Joan Canny_____
*Attorney for Plaintiff*

**AGREEMENT TO FURNISH BOEING 727-200
AIRCRAFT MANAGEMENT SERVICES**


**DATED AS OF NOVEMBER 16, 2006**


**BY AND BETWEEN**


**AMERIJET INTERNATIONAL, INC.**


**AND**


**ZERO GRAVITY CORPORATION**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................... 1

I.  DEFINITIONS ........................................................................................................ 1
    (A)  Defined Terms ............................................................................................. 1
    (B)  Interpretation ............................................................................................... 2

II.  PROVISION OF AIRCRAFT MANAGMENT SERVICES ..................... 3
    (A)  Generally ...................................................................................................... 3
    (B)  Services Exclusive to Zero-G ..................................................................... 3
    (C)  Term and Frequency of Service .................................................................. 3
    (D)  Service Obligations ..................................................................................... 4
    (E)  Obligations of Zero-G ................................................................................. 6

III.  PAYMENT TO CONTRACTOR ................................................................... 8
    (A)  Maintenance Fee ......................................................................................... 8
    (B)  Other Fees and Costs .................................................................................. 8
    (C)  Taxes ............................................................................................................ 8

IV.  REPRESENTATIONS AND WARRANTIES .............................................. 9
    (A)  Contractor's Representations ...................................................................... 9
        1.  Corporate Status ............................................................................. 9
        2.  Authority ......................................................................................... 9
        3.  No Conflicting Agreements ............................................................ 9
        4.  Governmental Approvals ................................................................ 9
        5.  Litigation ....................................................................................... 10
    (B)  Zero-G's Representations .......................................................................... 10
        1.  Corporate Status ........................................................................... 10
        2.  Authority ....................................................................................... 10
        2.  Governmental Approvals .............................................................. 10

V.  COVENANTS OF CONTRACTOR ............................................................ 11
    (A)  Further Assurances .................................................................................... 11
    (B)  Operating Requirements ............................................................................ 11
    (C)  Insurance .................................................................................................... 11
        1.  Hull and Liability Insurance ......................................................... 11
        2.  Worker's Compensation Insurance and Employer's Liability Insurance ...... 12
        3.  Comprehensive General Liability Insurance/Product Liability Insurance ..... 12
        4.  Insurance Certificates ................................................................... 12
        5.  Operation of Aircraft .................................................................... 12
        6.  Right to Insure .............................................................................. 13
        7.  Subcontractor ................................................................................ 13
    (D)  Maintenance of Records ............................................................................ 13
    (E)  Notification of Default ............................................................................... 13

(i)

VI.   **DEFAULT** ............................................................................................... **13**
    (A)   Default by Contractor ........................................................................ 13
    (B)   Default by Zero-G ............................................................................. 15

VII.   **SUBSTITUTE AIRCRAFT** ..................................................................... **16**

VIII.   **INDEPENDENT CONTRACTOR** ........................................................... **17**

IX.   **INDEMNIFICATION** .............................................................................. **17**
    (A)   Indemnification by Contractor .......................................................... 17
    (B)   Indemnification by Zero-G ................................................................ 18
    (C)   Claims Procedure .............................................................................. 18
    (D)   Cooperation ....................................................................................... 18
    (E)   Subrogation ....................................................................................... 19

XI.   **MISCELLANEOUS** ................................................................................. **19**
    (A)   Notices ............................................................................................... 19
    (B)   Validity, Waiver ................................................................................. 20
    (C)   Governing Law, Gender, Headings .................................................... 20
    (D)   Attorney's Fees .................................................................................. 20
    (E)   Successors and Assigns ...................................................................... 20
    (F)   Non-Disclosure and Confidentiality .................................................. 20
    (G)   Entire Agreement, Etc. ....................................................................... 20
    (H)   Force Majeure .................................................................................... 21
    (I)   Non-Exclusive Agreement ................................................................. 21
    (J)   Rights Cumulative ............................................................................. 21
    (K)   Survival ............................................................................................. 21

XII.   **CERTIFICATION** .................................................................................. **21**


**Appendix - A**    Charter Terms of Substitute/Replacement Aircraft
**Appendix  - B**    Estimate of Expenses

## AGREEMENT TO FURNISH BOEING 727-200
## AIRCRAFT MANAGEMENT SERVICES

THIS AGREEMENT TO FURNISH BOEING 727-200 AIRCRAFT MANAGEMENT SERVICES (this "**Agreement**") is made and entered into as of the 16th day of November, 2006, by and between AMERIJET INTERNATIONAL, INC., a Florida corporation ("**Contractor**"), and ZERO GRAVITY CORPORATION, a Maryland corporation ("**Zero-G**").

## PRELIMINARY STATEMENT

Zero-G has acquired or hereafter may acquire the Aircraft by lease or purchase and wishes to engage Contractor to operate and maintain the Aircraft for the exclusive use and benefit of Zero-G for the purpose of conducting FAA certified parabolic flights in accordance with the terms hereof. The Contractor wishes to operate and maintain the Aircraft for the exclusive use and benefit of Zero-G in accordance with the terms hereof.

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the parties hereby agree as follows:

**I.**     **DEFINITIONS**

(A)     <u>Defined Terms</u>. Except as otherwise specified, the following terms have the respective meanings set forth below for all purposes of the Agreement, and the definitions of such terms are equally applicable both to the singular and plural forms thereof.

"<u>Aeronautics Authority</u>" means, as appropriate, the United States Department of Transportation, the Secretary of Transportation, the FAA or the Administrator of the FAA, or any person, governmental department, bureau, commission or agency succeeding to the functions of any of the foregoing or otherwise having jurisdiction with respect to the ownership, leasing operation, use or maintenance of the Aircraft.

"<u>Air Carrier</u>" means any air carrier which is a United States "Supplemental Air Carrier" as defined in Part 121 of the FAR and has a Certificate of Public Convenience and Necessity issued pursuant to Section 401 or 418 of the Aviation Act.

"<u>Aircraft</u>" means the Boeing 727-200 Aircraft, FAA Registration Number N794AJ and such Substitute Aircraft as may be used from time to time pursuant to Article VII hereof.

"<u>Aircraft Engine</u>" or "<u>Engine</u>" means the total of all parts, components and accessories furnished by the engine manufacturer to the airframe manufacturer for installation on the Aircraft as the engine, and any subsequent substitution, replacement or modification or such parts, components and accessories, including but not limited to the engine driven fuel pump, fuel controller, gear box and bleed valves.

"<u>Aviation Act</u>" means the Federal Aviation Act of 1958, as amended from time to time, or any successor or substituted legislation at the time in effect and applicable, and the rules and regulations promulgated pursuant thereto.

1

"Block Hour" means, for the Aircraft, each hour or part thereof (computed to the nearest minute) elapsing from the moment the Aircraft begins movement under its own power at the airport at which a flight segment departs until such Aircraft comes to rest at the airport at which such flight segment terminates and such Aircraft is no longer moving under its own power.

"Business Day" means any day other than a day designated as a holiday by Zero-G.

"Departure" means each occasion upon which the Aircraft under the control of Contractor in the performance of Services in fact departs from a point of origination or an intermediate point on a flight.

"$" and "dollars" means the lawful currency of the United States of America. "Event of Default" means each of the events specified in Article VI hereof.

"FAA" means the United States Federal Aviation Administration or any person, governmental department, bureau, commission or agency succeeding to the functions thereof.

"FAR" means the regulations promulgated pursuant to the Aviation Act, as from time to time in effect.

"Lien" means any mortgage, pledge, lien, charge, encumbrance, lease, security interest or other claim.

"Management Fee" shall have the meaning set forth in Section (E)1 of Article III.

"Person" means an individual, a corporation, an association, a partnership, a trust or estate, a government or any agency or political subdivision thereof or any entity.

"Services" means the services to be performed by Contractor, including but not limited to routine and non-routine Services  and the actions  to be taken by Contractor pursuant to the terms of this Agreement.  All Services shall conform to applicable FAR's and Aeronautics Authority regulatory standards in accordance with Contractor's FAA approved practices of inspection, maintenance, overhaul and repair so as to enable Zero Gravity to preserve the airworthiness of the Aircraft, and insure the continued administration of and compliance with the Aircraft Maintenance plan.  Nothing to the contrary in this Agreement shall require either party to act or refrain from acting (1) contrary to any law, regulation, or order of any government or governmental agency or authority having jurisdiction over Zero Gravity's Aircraft (2) contrary to any permit or authorization granted to either party by any government, governmental authority or agency; or (3) contrary to any arrangement which would cause either party's insurance to be invalidated.

"Substitute Aircraft" means a substantially identical  aircraft designated as a "Substitute Aircraft" by Contractor pursuant to Article VI hereof.

(B)    Interpretation.  The terms used in the Agreement, unless otherwise defined herein or unless the context otherwise requires, shall have the meanings established by common

usage in the commercial air transport industry and in the course of dealing between Zero-G and Contractor.

## II.  PROVISION OF AIRCRAFT MANAGEMENT SERVICES

(A)  Generally. Contractor, as an independent contractor, shall operate the Aircraft exclusively for the use and benefit of, and shall maintain the Aircraft for, Zero-G for its parabolic flight services and furnish to Zero-G the Services, upon the terms and conditions set forth herein.

(B)  Services Exclusive to Zero-G. The Aircraft will be painted in Zero-G's livery. Contractor agrees that the Aircraft shall be used by Contractor during the term of this Agreement exclusively to provide Services for Zero-G hereunder unless otherwise authorized by Zero-G in writing.

(C)  Term and Frequency of Service.

1.  The Aircraft shall be operated and maintained by Contractor in such a manner so as not to exceed the FAR limits of one full-time flight crew. Upon execution of this Agreement, Zero-G shall provide Contractor with an estimated flight schedule for the first three (3) calendar months of the term of this Agreement. Thereafter, on the first day of each calendar month, Zero-G shall update the flight schedule so that at all times there shall be a three (3) month estimated flight schedule in place. Contractor recognizes that Zero-G does not operate on a fixed schedule, rather that Zero-G is a nascent entrepreneurial company that does its best to respond to its customer demands.

2.  Zero-G shall also provide Contractor with as much written notice as practicable of any requested changes to the estimated flight schedule. Contractor will accommodate any changes to the estimated flight schedule provided with more than seven-days notice, and will use commercially reasonable efforts to be responsive to Zero-G's schedule and accommodate any last minute changes provided with less than seven (7) days notice, provided Contractor shall not be in default under this Agreement if it is unable to do so.

3.  Except as otherwise provided in Article VI hereof, the term of this Agreement shall commence upon completion of the Aircraft C-Check (estimated on or before March 31st, 2007) or such other date as mutually agreed by both parties to this Agreement, and shall expire 4-years later (estimated on March 31st, 2011, unless terminated by either party giving the other party six (6) months prior written notice. Thereafter the term of this Agreement shall be extended on a month-to-month basis until terminated by either party giving the other party thirty (30) days prior written notice.

4.  Notwithstanding the foregoing, the term of this Agreement may terminate at Zero Gravity's option if the Aircraft which is the subject of any unrepairable damage or destruction The date of termination shall be the date Zero-G notifies Contractor of such termination, which date may be, but is not required to be, after the date of such damage beyond economic repair or destruction.

(D)    Service Obligations.  Except to the extent that Zero-G is responsible to pay for or provide for personnel, services and other items pursuant to Section II(E) hereof, Contractor, at Contractor's sole cost and expense, shall be responsible to pay for and provide all personnel, services, maintenance, supplies and other items necessary or advisable in connection with the performance of the Services in accordance with applicable Aeronautics Authority requirements and other standards and applicable laws and the terms of this Agreement, including but not limited to the following:

1.    Contractor shall provide all FAA qualified flight crews (with exception of eight flight attendants which are provided by Zero-G and employed as flight attendants by the Contractor during the time periods they are serving in the flight crew and certified by the Contractor) necessary to operate the Aircraft in accordance with this Agreement.  Additional flight attendants beyond eight will be added as mutually agreed.  All such personnel shall be properly qualified and/or FAA licensed as pilots, flight engineers or flight attendants, as the case may be with respect to the Aircraft they are operating.

2.    Contractor shall provide all maintenance crews and management personnel necessary or advisable for the operation and maintenance of the Aircraft, including, but not limited to dispatchers, and supervisory and administrative personnel.  The Director of Inflight will be provided and employed by Zero-G, paid by Zero-G and report to the Contractor. The Director will be headquartered at the Contractor's offices and approved by the Contractor. The Director of Inflight's primary responsibility is managing the responsibilities and duties of the Amerijet flight attendants.  They shall have all required FAA licenses and ratings in full force and effect and shall be properly qualified to perform the operations and maintenance work on the Aircraft.

3.    Contractor shall provide for all flight and maintenance crew training in accordance with contractor's FAA approved flight and crew training policies and procedures.

4.    Contractor shall pay (i) all compensation of Contractor's employees (including but not limited to salaries, social security, premiums for medical and other insurance (including employee's liability insurance and worker's compensation insurance, payroll taxes, pension costs and other fringe benefits), (ii) all per diem allowances or meals for the flight crews, maintenance crews; dispatchers, supervisory and administrative personnel and (iii) all other related expenses, including accommodations and transportation at, to and from the airport, for the flight crews, maintenance and other ground staff and any other Contractor personnel at all locations.

5.    During the term of this Agreement Contractor shall maintain the Aircraft in good working order and good condition in accordance with the standards of a prudent major international air carrier and in strict compliance with all the requirements of FAR Part 121, Contractor's own maintenance program, and all other applicable Aeronautics Authority rules and regulations. Contractor shall maintain the airworthiness certificate for the Aircraft in full force and effect, without material restrictions. Contractor shall maintain the neat and clean appearance (to include necessary paint touch-up) of the Aircraft.

6.    Contractor shall perform or cause to be performed all maintenance, service, overhaul and repair of rotable components and parts in accordance with the Contractor's

FAA approved maintenance program under which the Aircraft is operated, including but not limited to on line maintenance (specifically "A" phase checks, "B" phase checks and preflight, docking and in-transit maintenance of the Aircraft) and heavy maintenance, including off-wing engine repair and overhaul, landing gear overhaul, "C" checks, "D" checks and APU replacement, repair and overhaul  and shall furnish the mechanics, services and facilities to accomplish such maintenance using workmanship and procedures in strict compliance with applicable FAA standards and the applicable manufacturer's recommendations and warranty requirements. Only FAA-approved parts and materials, suitable for their intended use shall be installed in the Aircraft. All replacement parts will be free and clear of liens  If any repair of the Aircraft is required to be made during the term of this Agreement by reason of an Airworthiness Directive, regulation or advisory circular promulgated by the FAA or Alert Service Bulletin issued by the Engine manufacturer, Contractor shall promptly notify Zero Gravity of same in order to assess the cost, out-of-service time, etc.  which could materially adversely affect Zero Gravity under this Agreement.  Contractor will not make material modifications or alterations to the Aircraft without Zero Gravity's prior written consent, Contractor agrees to keep Zero-G's notified of any maintenance required on the Aircraft which could affect safety, performance or deviations of the estimated schedule and to provide ZERO-G with a monthly report of all work performed on the aircraft.

7.      Contractor shall make available for inspection upon request by Zero-G at any time and from time to time during the term of this Agreement (and Zero-G shall have the right to inspect) the Aircraft, the maintenance facilities and procedures of Contractor, and any books, manuals, revision services, documents, files, data or records in the possession of Contractor relating to the Aircraft or any related spare engines or spare parts.

8.      Contractor shall provide (a) all expendable, consumable and rotable components and parts, (b) line shop and. service supplies, and (c) shipping of all parts. In addition, Contractor shall perform routine maintenance of spare parts.

9.      Contractor shall submit to Zero-G, at such time and in such manner as Zero-G may from time to time reasonably request, reports concerning flight exceptions, aircraft systems, engine reliability and other matters.

10.     Contractor shall timely expedite and perform flight planning and aircraft dispatching and shall manage all communications and operations. All flight operations shall be under exclusive control of Contractor.

11.     Contractor shall diligently pursue against manufacturers and vendors on behalf of Zero-G all warranties and warranty claims with respect to the Aircraft, spare engines and spare parts.

12.     Contractor shall prepare all flight and maintenance related documents and shall routinely furnish Zero-G with such information regarding the Aircraft.

13.     Contractor shall prepare all returns, reports and other filings relating to any tax  based upon the property, the net or gross income or receipts of Contractor.

14.    Contractor shall pay and discharge when due all liabilities and obligations Contractor may have with respect to any Person which could result in a Lien with respect to the Aircraft, any Aircraft Engine or any spare engines or spare parts or which could adversely affect the performance of Contractor's obligations hereunder, including, but not limited to, obligations owing Contractor's employees, suppliers, vendors, lessors and subcontractors. Contractor shall not create or permit to exist any Lien upon the Aircraft, any Aircraft Engine, spare engine or spare part except Liens created by Zero-G or by Persons which are lawfully claiming by or through Zero-G and which claims are not related to any obligations of Contractor hereunder. At no time shall Contractor attempt, or hold itself out as having any power, to sell, lease or otherwise deal with the Aircraft, any Aircraft Engine or any spare engine or spare parts.

15.    Contractor shall not do or permit to be done anything which may reasonably be expected to expose the Aircraft to a risk of forfeiture, impound, detention, damage or destruction.

(E)    <u>Obligations of Zero-G</u>.

1.    Zero-G shall pay Contractor a monthly management fee (the **"Management Fee"**) of                          In this management fee are included the following:

(a) Flight Control, Scheduling and Planning
(b) Maintenance Control
(c) Maintenance Management
(d) Maintenance Oversight
(e) Flight Crew Training Oversight
(f) Flight Crew Records and Equipment
(g) AOC Oversight (Manuals and FAA Compliance) for the manuals, systems and procedures currently in place.  Additional changes to be billed separately.
(h) Amerijet (Contractor's) profit

2.    Zero-G shall pay or reimburse  Contractor as provided herein an amount equal to Contractor's cost for the following

(a)    salaries and benefits for pilots and flight engineers;

(b)    flight and maintenance crew training;

(c)    implementation of manufacturer's service bulletins and FAA airworthiness directives;

(d)    structural repairs to the Aircraft;

(e)    power carts used for loading and unloading operations and scheduled departure starts;

(f)    costs associated with air start-ups;

(g)     towing and pushback fees;

(h)     parking and ramp charges;

(i)     hangarage;

(j)     aircraft de-icing;

(k)     landing fees;

(l)     spare aircraft engines

(m)     per diem allowances, meals, accommodations and transportation; for flight crew and other personnel (excluding flight attendants and Director of Inflight Services); and

(n)     on-line and heavy maintenance (including labor, parts and shipping).

3.     Contractor agrees that Zero-G will pay for the following items

(a)     Salaries and benefits for flight attendants and Director of Inflight Services; and

(b)     fuel.

4.     Upon execution of this Agreement, Contractor agrees to provide ZERO-G with a best historical estimate or range of expenses related to 2(a), 2(b), 2(l), 2(m), and 2(n) in Appendix B.

5.     Contractor shall obtain and maintain insurance as outlined in Article V. To the extent insurance is obtained and maintained by Contractor for the benefit of Zero-G as provided therein, Zero-G shall reimburse Contractor for the cost thereof.

6.     Zero-G shall have no payment obligations related to the normal operation of the Aircraft except for those outlined above in Section II (E).

### III.   PAYMENT TO CONTRACTOR

(A)   <u>Management Fee</u>.  On or before the first (1st) day of each calendar month during which the Contractor performs Services pursuant to this Agreement, Zero-G shall pay the monthly Management Fee.  The first and last calendar months fee shall be prorated on a per-diem basis.  While the Aircraft is undergoing maintenance and is out –of- service, (such as when the Aircraft is undergoing a "C" check) Zero Gravity will only pay Contractor's direct expenses in lieu of the Management Fee.  The monthly Management Fee would be prorated on a per diem basis based upon a thirty (30) day calendar month.  Estimated expenses are set forth in APPENDIX-B "Estimate of Expense."

(B)   <u>Other Fees and Costs</u>.  All fees and costs which are to be paid or reimbursed to Contractor by Zero-G pursuant to Section II(E) hereof, shall be due and payable by Zero-G to Contractor within ten business (10) days of receipt by Zero Gravity of invoices for such fees and costs.  Contractor agrees to promptly provide Zero-G with any back-up information reasonably requested by Zero-G with respect to a reimbursement request.

(C)   <u>Taxes</u>.

1.   Zero-G shall pay all taxes imposed by any governmental authority upon the payments to Contractor made by Zero-G pursuant to the terms of this Agreement, including, but not limited to, any federal, state or local transportation or excise taxes as may from time to time be applicable.  Notwithstanding the foregoing, Zero-G shall not be responsible for (a) any tax imposed on or measured by the gross or net income, receipts, capital or net worth, franchises, excess profits or conduct of business of Contractor, (b) any taxes imposed upon Contractor by any jurisdiction if such taxes result from the present, future or former connection of Contractor (or any affiliate of Contractor) to such jurisdiction, (c) taxes which arise out of or are caused by any negligence or willful misconduct of Contractor, or any act or failure to act prohibited by this Agreement or any misrepresentation by Contractor, or any failure by Contractor to claim on a timely and proper basis applicable exemptions or reductions, (d) taxes to the extent attributable to any period after the termination or expiration of the term of this Agreement, (e) taxes which are imposed as a result of a voluntary or involuntary bankruptcy of Contractor, (f) taxes imposed on a transferee of Contractor of any interest in this Agreement to the extent the amount of such taxes exceeds the amount of such taxes that would not have been imposed had there not been such a transfer, or (g) penalties, fines, additions to tax or interest to the extent resulting from the negligence or misconduct of Contractor in giving Zero-G any notice required in the immediately succeeding paragraph, or the failure to file any returns that are timely and proper.

2.   Contractor shall notify Zero-G at least thirty (30) days prior to the due date for any taxes subject to indemnification pursuant to the preceding paragraph (1) or immediately upon determination of assessment thereof of any such taxes.  If directed in writing by Zero-G, Contractor shall, at Zero-G's expense, take such action as Zero-G may request to contest the imposition of such tax and shall, if requested, permit Zero-G in Contractor's name to contest the imposition of such tax.  Contractor shall at Zero-G's expense fully cooperate with Zero-G in contesting such claim, give Zero-G any relevant information relating to such claim which may be within Contractor's knowledge or control, and file any necessary documents

which may be required regarding such claim. In the event Contractor fails to contest or fails to permit Zero-G to contest any claim for taxes, Zero-G shall not be obligated to indemnify Contractor for any such taxes.

       3.    If, as a result of a payment of an indemnity, Contractor shall realize a tax benefit not previously taken into account in computing the amount of such payment, or shall obtain a refund of all or any part of a tax paid by Zero-G or with respect to which Zero-G had made an indemnity payment, the Contractor shall pay Zero-G the amount of such refund, or benefit (taking into account any tax consequences to Contractor with respect to the receipt of such a refund and the payment of such amounts over to Zero-G) within thirty (30) days after Contractor receives such refund or realizes such benefit. If, in addition to such refund, the Contractor shall receive an amount representing interest on the amount of such refund, Zero-G shall be paid that proportion of such interest which is fairly attributable to taxes paid by Zero-G or paid by the Contractor with funds provided by Zero-G.

## IV.    <u>REPRESENTATIONS AND WARRANTIES</u>

    (A)   <u>Contractor's Representations</u>. Contractor represents and warrants that on the date hereof:

       1.    <u>Corporate Status</u>. Contractor is a corporation duly organized, validly existing, in good standing under the laws of the State of Florida and is licensed or qualified to do business in all jurisdictions where the failure to do so could have a material or adverse effect on its ability to perform its obligations hereunder.

       2.    <u>Authority</u>. Contractor has the full power, authority and legal right to execute, deliver and perform the terms of this Agreement, including, but not limited to, under the laws, rules and regulations of the Aeronautics Authority. This Agreement has been duly authorized by all necessary corporate action of Contractor and has been duly executed and delivered, and it constitutes a legal, valid and binding obligation of Contractor enforceable in accordance with its terms. This Agreement does not contravene any law, governmental rule, regulation or order known to and binding on Contractor or contravene the certificate of incorporation or bylaws of Contractor or contravene the provisions of or constitute any default under, or result in the creation of any lien upon any of the property of Contractor under, any indenture, mortgage, contract or other agreement to which Contractor is a party or by which it is bound.

       3.    <u>No Conflicting Agreements</u>. Contractor is not in default under any agreement to which it is a party nor is Contractor a party to any agreement or instrument or subject to any charter or other corporate restriction, which individually or in the aggregate might materially adversely affect the financial or other condition, business, assets, liabilities or operations of Contractor or the ability of Contractor to perform its obligations under this Agreement.

       4.    <u>Governmental Approvals</u>. All necessary licenses, permits, consents or approvals of, notices to or registrations with or the taking of any other action in respect of, the Aeronautic Authority's or any other federal, state, foreign or applicable governmental authority or agency required to be obtained or accomplished by Contractor in connection with the

execution and delivery by Contractor of this Agreement and for providing the Services have been obtained or accomplished by Contractor in connection with the execution and delivery by Contractor of this Agreement and for providing the Services have been obtained or accomplished by Contractor and Contractor is an Air Carrier with operating authority under FAR Part 121 and with a Certificate of Public Convenience and Necessity from the Department of Transportation issued under Section 401 or 418 of the Aviation Act.

      5.    <u>Litigation</u>.

         a.    There are no pending or, to its knowledge, threatened actions or proceedings to which Contractor is a party which might materially adversely affect the financial or other condition, business, assets, liabilities or operations of Contractor or the ability of Contractor to perform its obligations under this Agreement; and

         b.    There are no pending or, to its knowledge, threatened actions or proceedings of which Contractor has knowledge before any court or administrative agency which might materially adversely affect the financial or other condition, business, assets, liabilities or operations of Contractor or the ability of Contractor to perform its obligations under this Agreement.

      (B)    <u>Zero-G's Representations</u>.  Zero-G represents and warrants to Contractor that on the date hereof:

      1.    <u>Corporate Status</u>.  Zero-G is a corporation duly organized, validly existing, and in good standing under the laws of the State of Maryland.

      2.    <u>Authority</u>.  Zero-G has the full power, authority and legal right to execute, deliver and perform the terms of this Agreement.  This Agreement has been duly authorized by all necessary corporate action of Zero-G and has been duly executed and delivered and delivered and it constitutes a legal, valid and binding obligation of Zero-G enforceable in accordance with its terms.  This Agreement does not contravene and law, governmental rule, regulation or order known to and binding on Zero-G or contravene the certificate of incorporation or bylaws of Zero-G or contravene the provisions of or constitute any default under, result in the creation of any lien upon any of the property of Zero-G under, any indenture, mortgage, contract or other agreement to which  Zero-G is a party or by which it is bound.

      3.    <u>No Conflicting Agreements</u>.  Zero-G is not in default under any agreement to which it is a party nor is Zero-G a party to any agreement or instrument or subject to any charter or other corporate restriction, which individually or in the aggregate might materially adversely affect the financial or other condition, business, assets, liabilities or operations of Zero-G or the ability of Zero-G to perform its obligations under this Agreement.

      4.    <u>Governmental Approvals</u>.  All necessary licenses, permits, consents or approvals of, notices to or registrations with or the taking of any other action in respect of, the Aeronautic Authority's or any other federal, state, foreign or applicable governmental authority or agency required to be obtained or accomplished by Zero-G in connection with the execution, delivery and performance by Zero-G of this Agreement for allowing parabolic flights have been obtained or accomplished by Zero-G.

## V.     COVENANTS OF CONTRACTOR

Contractor covenants and agrees with Zero-G as follows:

(A)     Further Assurances.   Contractor will cause to be done, executed, acknowledged and delivered each and every future acts, documents and assurances as Zero-G may reasonably require for accomplishing the purposes of this Agreement or in connection with the financing relating to the Aircraft.

(B)     Operating Requirements.

(C)     Insurance.   Each party hereto will at all times until the term hereof has expired or been terminated, cause to be carried and maintained, the applicable insurance coverage, in an amount not less than the amount, and containing the provisions, terms and conditions set forth below.

1.     Hull and Liability Insurance.

During the term of this Agreement:

a.     Contractor will obtain, carry and maintain "all risk" hull insurance (including any war risk hull insurance) for the Aircraft for the benefit of Zero-G in the amounts and type specified herein.   Zero-G shall have no interest in, or right to claim any amounts payable under any such insurance.   The aircraft hull insurers or underwriters to waive their rights of subrogation against Zero-G.   Contractor shall maintain insurance of spare parts and other property even if used or held for use with respect to the Aircraft for the benefit of Zero-G and shall cause its property insurers or underwriters to waive their rights of subrogation against Zero-G.   The cost of insurance set forth in this **Section V(C)(1)(a)** shall be reimbursed by Zero-G to Contractor as provided in **Section II(E)(5)** hereof.

b.     Contractor will obtain, carry and maintain comprehensive general aircraft liability insurance, including bodily injury, aircraft  liability, property damage liability, and contractual liability for the benefit of Zero-G (but excluding any product liability insurance), in an amount not less than $200,000,000 on a combined single limit basis, and personal injury liability insurance (but excluding any product liability insurance) in an amount not less than $200,000,000 each occurrence/aggregate on a combined single limit basis.   Contractor shall have the right to provide any portion or all of such liability insurance, including, without limitation, war liability insurance, by means of governmental insurance or indemnities and with the use of any type of self-insurance generally applicable to Contractor's fleet, including, but not limited to, by means of deductibles, captive insurance companies, premium adjustment provisions, self-insurance programs or otherwise.   The cost of insurance set forth in this **Section V(C)(1)(b)** shall be reimbursed by Zero-G to Contractor as provided in **Section II (E)(5)** hereof.

c.     Zero-G shall, at its expense, obtain, carry and maintain passenger liability insurance in an amount not less than $200,000,000 on combined single limit basis. Zero-G's passenger liability insurance will name Contractor as an additional insured under its policy as its interest may appear at the time of loss, and will provide that any modification, alteration and/or change which is material and adverse to Contractor (it being agreed that a

reduction in coverage to an amount equal to or greater than the applicable minimum specified above shall not be considered to be adverse to Contractor) to, or cancellation of, such policy shall only be effective as to Contractor upon receipt by Contractor of ten (10) days' prior written notice, or seven (7) days' written notice as respects war and allied perils coverage, or otherwise to the extent of the prevailing notice period then provided by the applicable insurance market.

    2.    <u>Worker's Compensation Insurance and Employer's Liability Insurance</u>.

    a.    Each of Contractor and Zero-G agree to cause to be obtained and maintained, each with respect to its own employees, and at its sole cost and expense, statutory Worker's Compensation Insurance covering the jurisdictions in which it operates.    Each party's insurance policy will contain all states' and foreign coverage endorsements.

Each of Contractor and Zero-G agree to cause to be obtained and maintained, for its own account and interest, at its sole cost and expense, employer's liability coverage.

    3.    <u>Comprehensive General Liability Insurance/Product Liability Insurance</u>. Contractor, at its sole cost and expense, shall cause to be obtained and maintained comprehensive general liability insurance, including contractual liability, which, without limitation, shall specifically insure the indemnity of Contractor in Article IX including product liability insurance with respect to any maintenance, modifications or repairs performed on the Aircraft by Contractor or any of its subcontractors, in an amount not less than $200,000,000, each occurrence/aggregate naming Zero-G as an additional insured thereunder and otherwise in form and substance reasonably satisfactory to Zero-G. In addition to the foregoing, Contractor shall cause Zero Gravity to be named as an additional insured/indemnitee with regard to third party maintenance supplies/vendors performing maintenance services on the Aircraft.  By way of example should Contractor sub-contract heavy maintenance (C-check, etc) to a third party maintenance facility wherein such facility names Contractor as an additional named insured, Contractor shall require that Zero Gravity be included as an additional named insured.

    <u>4. Insurance Certificates</u>. Before the furnishing by Contractor of any Services and again prior to the expiration or renewal of any policy of insurance during the term of this Agreement, the insuring party shall deliver to the other party certificates of insurance evidencing the insurance required to be carried hereunder, certifying that all of the required insurance is in full force and effect, and describing such insurance and the limits in reasonable detail, that the same has been properly indorsed with respect to its contractual undertaking and waiver of subrogation as provided herein.

    Such insurance shall provide that any modification, alteration and/or change which is material and adverse to party to, or cancellation of, such insurance shall only be effective as to the insured party upon receipt by such party of thirty (30) days' prior written notice.

    <u>5. Operation of Aircraft</u>. Contractor shall not operate or permit to be operated, or locate or permit to be located, the Aircraft (a) in any manner which could impair, render voidable, violate or be contrary to the terms of any applicable policy of insurance, or (b) in any

area where insurance coverage is not in effect or is impaired or is rendered voidable as a result thereof or which is prohibited by or violates the terms of any policy of insurance.

6. Right to Insure. In the event that Zero-G or Contractor, as the case may be, fails to maintain the insurance required to be obtained and maintained by it pursuant to this Section, Contractor or Zero-G, as the case may be, may, with reasonable advance written notice to the other, at its option but without any obligation, provide such insurance and if it so. elects, which it may do in its absolute discretion, as to itself alone and not the other person. The cost of providing such substitute insurance shall be payable on demand by the party which was obligated hereunder to maintain the applicable insurance together with interest thereon at the rate of 10% per annum from and including the date of demand to and excluding the date paid.

7. Subcontractor.  Contractor shall cause each of its subcontractors, if any, to obtain and maintain the insurance described in this Article V to be carried by Contractor. Notwithstanding the foregoing, Contractor will not be relieved of liability in the event any of its subcontractors fails to obtain and maintain the required insurance or for any liability which that occurs in excess of that coverage provided by subcontractor.

(D)    Maintenance of Records. Contractor shall maintain in English all flight and maintenance records, logs and other materials required by the Aeronautics Authority, and all manuals, revision services, data bases and other materials required by or provided by the manufacturer or Zero-G, on an up-to-date basis and in the manner required by the Aeronautics Authority and consistent with the standards of major international air carriers.

(E)    Notification of Default. Each party shall notify the other party of the occurrence of any Event of Default or the existence of any circumstances which with notice or the passage of time, or both, would become an Event of Default promptly after such party  has knowledge thereof.

## VI.    DEFAULT

(A)    Default by Contractor.  Without limiting the obligations of Contractor or the rights and remedies of Zero-G as provided in this Agreement, each of the following events (whether any such event shall be voluntary or involuntary or arise by operation of law or due to any compliance with any law, rule or regulation or any judgment, order or decree) shall constitute an "Event of Default":

(i)    Contractor shall fail to make any payment under this Agreement required to be made by Contractor hereunder (including, without limitation, any payment to an employee, supplier, vendor, lessor or subcontractor of Contractor) when due and payable, and not subject to a bona fide dispute and such failure continues unremedied for a period of fifteen (15) Business Days;

(ii)    if Contractor shall fail to carry, obtain and maintain insurance required in accordance with the provisions of Section V(C) hereof, which failure continues unremedied for a period of fifteen (15) Business Days;

(iii)     if Contractor shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by it under this Agreement not otherwise covered specifically in Section (A) of this Article VI and such failure shall continue uncured for a period of thirty (30) days after written notice thereof to Contractor from Zero-G so long as Contractor;

(iv)     if any of Contractor defaults under that certain Aircraft Lease Agreement of even date herewith (the "**Lease**") between Contractor and Zero-G, subject to applicable notice, grace and cure periods contained therein;

(v)     any representation or warranty made or deemed made by Contractor in or pursuant to this Agreement or in any document or certificate delivered pursuant to this Agreement is or proves to have been incorrect in any material respect when made or deemed made;

(vi)     Contractor assigns or sublets or attempts to assign or sublet any of its rights or delegates or attempts to delegate any of its duties or obligations under this Agreement without the prior written consent of Zero-G;

(vii)     Contractor consents to the appointment of a custodian, receiver, trustee, examiner or liquidator of itself or of a substantial part of its property, or Contractor makes a general assignment of the benefit of creditors, or Contractor admits in writing its inability to pay its debts generally as they become due, or Contractor is unable to or does not pay its debts generally as they come due, or Contractor files a voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization in a proceeding under any bankruptcy laws (as now or hereafter in effect) or an answer admitting the material allegations of a petition, or Contractor by voluntary petition, answer, or consent seeks relief under the provisions of any other existing or future bankruptcy, reorganization or other similar law providing for the reorganization or winding up of corporations, or providing for an agreement, composition, extension or adjustment with its creditors, or any corporate action is taken by Contractor in furtherance of any of the foregoing;

(viii)     an order, judgment or decree is entered by any court or governmental agency of competent jurisdiction appointing, without the consent of Contractor, a custodian, receiver, trustee, examiner or liquidator of Contractor or of any substantial part of its property, or any substantial part of the property of Contractor is sequestered, and any such order, judgment or decree of appointment or sequestration remains in force undismissed, unstayed or unvacated for a period of thirty (30) days after the date of entry thereof;

(ix)     a petition against contractor in a proceeding under the bankruptcy, reorganization or similar laws of the United States of America or any other insolvency laws (as now or hereinafter in effect) of any competent jurisdiction is filed and is not withdrawn or dismissed within thirty (30) days thereafter, or if, under the provisions of any law providing for reorganization or winding-up of corporations which may apply to Contractor, any court of competent jurisdiction assumes jurisdiction, custody or control of Contractor or of any substantial part of its property and such jurisdiction, custody or control remains in force or unrelinquished, unstayed or undismissed for a period of thirty (30) days, or if in any such case at any time an order for relief is granted;

(x)    Contractor voluntarily or involuntarily ceases or suspends all or any substantial part of its operations for any reason whatsoever including but not limited to a cause beyond the control of Contractor as described in Section (H) of Article XI, or Contractor announces a future cessation or suspension of all or any substantial part of operations for any reason whatsoever, other than in each case as excused by Section (H) of Article XI hereof, or Contractor ceases or suspends any of its Services hereunder or announces a future cessation or suspension of any thereof for any reason whatsoever, other than as excused by Section (H) of Article XI;

(xi)    it is or becomes unlawful for Contractor to perform any of its obligations hereunder or this Agreement becomes wholly or partially invalid; or

(xii)    the airworthiness certificate of the Aircraft is revoked, suspended, canceled, withdrawn, terminated or not renewed or otherwise ceases to be in full force and effect or becomes subject to any material restriction; or any consent, authorization, license, certificate or approval of or registration with any governmental authority applicable to Contractor's performance of its obligations under this Agreement, including, without limitation, its certificate issued under FAR Part 121 or its Certificate of Convenience and Necessity issued under the Aviation Act, is not made or is not maintained in full force and effect or otherwise revoked, suspended, canceled, withdrawn, terminated or not renewed for any reason whatsoever.

Upon the occurrence of any Event of Default described in clause (vi), (vii) or (viii) above, this Agreement and Zero-G's obligations and Contractor's rights hereunder shall terminate immediately upon written notice,  and upon the occurrence and during the continuance of any other Event of Default, Zero-G shall immediately be entitled to terminate this Agreement and Zero-G's obligations and Contractor's rights under this Agreement by notice thereof to Contractor, in each without cost or penalty of any kind and without limiting Zero-G's rights or remedies at law or in equity with respect thereto, including, but not limited to the recovery of damages due to such a termination.

(B)    <u>Default by Zero-G</u>. Without limiting the obligations of Zero-G or the rights and remedies of Contractor as provided in this Agreement, each of the following events (whether any such event shall be voluntary or involuntary or arise by operation of law or due to any compliance with any law, rule or regulation or any judgment, order or decree) shall constitute an "Event of Default":

(i)    If Zero-G shall fail to make any payment  under this Agreement required to be made by Zero-G, for a charge which has not be contested (and not subject to a bona fide dispute) or for which adequate backup information has been provided, hereunder and such failure continues unremedied for a period of fifteen (15) Business Days;

(ii)    If Zero-G shall fail to carry, obtain  and maintain insurance required  in accordance with the provisions of Section V(C) hereof, which failure continues unremedied for a period of fifteen (15) Business Days;

(iii)    If Zero-G shall fail to perform or observe any other  material covenant, condition or agreement to be performed or observed by it under this Agreement and if such

failure shall continue unremedied for a period of thirty (30) days after written notice thereof to Zero-G from Contractor;

(iv)    If Zero-G defaults under the Lease Agreement, subject to applicable notice, grace and cure periods contained therein;

(v)    Zero-G consents to the appointment of a custodian, receiver, trustee or liquidator of itself or of a substantial part of its property, or makes a general assignment for the benefit of creditors, or Zero-G admits in writing its inability to pay its debts generally as they become due, or Zero-G is unable to or does not pay its debts generally as they become due, or Zero-G files a voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization in a proceeding under any bankruptcy laws (as now or hereafter in effect) or an answer admitting the material allegations of a petition, answer, or consent, seeks relief under the provisions of any other existing or future bankruptcy or other similar law providing for the reorganization or winding up of corporations, or providing for an agreement, composition, extension or adjustment with its creditors;

(vi)    An order, judgment or decree is entered by any court or governmental agency of competent jurisdiction appointing, without the consent of Zero-G, a custodian, receiver, trustee or liquidator of Zero-G or of any substantial part of its property, or any substantial part of the property of Zero-G is sequestered, and any such order, judgment or decree of appointment or sequestration remains in force undismissed, unstayed or unvacated for a period of thirty (30) days after the date of entry thereof;

(vii)    A petition against Zero-G in a proceeding under the bankruptcy laws of the United States of America or other insolvency laws (as now or hereinafter in effect) is filed and is not withdrawn or dismissed within thirty (30) days thereafter, or if, under the provision of any law providing for reorganization or winding-up of corporations which may apply to Zero-G any court of competent jurisdiction assumes jurisdiction, custody or control of Zero-G or of any substantial or of any substantial part of its property and such jurisdiction, custody or control renames in force on unrelinquished, unstayed or undismissed for a period of thirty (30) days, or if in any such case at any time an order for relief is granted; or

(viii)    Zero-G takes any action, which in Contractor's sole and absolute opinion (which opinion shall be final, binding and conclusive), jeopardizes any of the certifications set forth in Section (A)(xi) of this Article VI.

Upon the occurrence of any Event of Default described in clause (v), (vi), (vii) or (viii), Contractor shall immediately be entitled to terminate this Agreement and its obligations and Zero-G's rights under this Agreement by notice thereof to Zero-G, in each case without cost or penalty of any kind and, without limiting Contractor's rights in respect of the recovery of damages due to such a termination.

## VII.    SUBSTITUTE AND SECONDARY AIRCRAFT

Contractor shall immediately inform Zero-G in the event that the Aircraft is not available to fly as scheduled for Zero-G. In this case, or in such a case as a second aircraft is required to fulfill Zero-G customer demand, Contractor shall make a good faith effort to provide N994AJ, a

parabolic-modified Substitute Aircraft per the terms of Appendix A.  The terms and conditions regarding a Substitute and Secondary aircraft shall be set forth in the existing Charter Agreement between the parties or as otherwise agreed to in writing by the parties.

## VIII.   <u>INDEPENDENT CONTRACTOR</u>

Contractor is an independent Contractor and, without waiving any rights or remedies hereunder in favor of Zero-G, Zero-G shall not in any manner supervise, direct or control Contractor's performance under this Agreement. Contractor shall not in any manner supervise, direct or control any of the employees of Zero-G or of the operator of the Zero-G Hub. The employees of Contractor engaged in performing services hereunder shall be considered employees of Contractor for all purposes and under no circumstances shall be deemed employees of Zero-G. Employees of Zero-G shall be considered employees of Zero-G for all purposes and under no circumstances shall be deemed employees of Contractor. Nothing in this Agreement shall be construed as giving one party to this Agreement control over the managerial practices, financial administration or personnel practices, policies or procedures of the other party. Contractor shall have full and exclusive liability for the payment of workers' compensation and employer's liability insurance premiums with respect to its employees and for the payment of all taxes, contributions and other payments for unemployment compensation or annuities now or hereinafter imposed upon employers by the government of the United States of America or by any individual state, local or foreign authority with respect to such employees.

## IX.   <u>INDEMNIFICATION</u>

(A)   <u>Indemnification by Contractor</u>. Contractor shall indemnify, protect, defend and hold harmless Zero-G and its affiliates any  parent company and each of their officers, directors, agents, servants and employees (the "**Zero-G Indemnitees**") from and against all liabilities and reasonable expenses, including but not limited to reasonable expenses of defense (including reasonable legal fees and expenses) and other reasonable expenses, for injury to or death of any person and for loss of or damage to any property, including the Aircraft and any cargo, arising directly or indirectly out of the possession, location, transfer, control or in any manner connected with the  condition, maintenance, modification, repair, use or operation of the Aircraft, including, without limitation, operations thereof by Contractor's flight crews and any patent or latent defect, whether or not discoverable, occurring  after the delivery date or during the term of this Agreement, whether or not such injury, death or damage shall have occurred during carriage by air, or maintenance, modification or repair of the Aircraft to the extent a claim in respect thereof is of a type that could be covered by product liability insurance. Contractor also agrees to defend (if requested by an applicable Zero-G Indemnitee but failure to request such defense shall not reduce or otherwise affect Contractor's liability for the reasonable expenses of such defense by such Zero-G Indemnitee), indemnify and hold harmless each Zero-G Indemnitee from and against all liabilities and reasonable expenses, including but not limited to reasonable expenses of defense (including reasonable legal fees and expenses) and other reasonable expenses which are asserted against or suffered or incurred by any Zero-G Indemnitee arising out of or in any manner connected with any Services which constitute or are alleged to constitute an infringement of patent, copyright, trademark, design or other proprietary rights or a breach of any obligation of confidentiality. Contractor hereby waives, releases and renounces any and all claims and recourse rights now or hereafter existing against any Zero-G

Indemnitee, and Contractor agrees not to claim against or sue any Zero-G Indemnitee, for any claim, injury, loss, damage, obligation, liability or expense to be indemnified by Contractor, including, without limitation, any claim arising out of death or personal injury to any of Contractor's or its affiliates' or their subcontractors, officers, directors, agents, servants or employees or any loss or damage to property of Contractor or of any other such Person which may result from or arise out of the possession, condition, maintenance, modification, repair, use of operation of the Aircraft, including, without limitation, any latent or patent defect whether or not discoverable.

(B)    Indemnification by Zero-G. Except for liabilities and expenses to be indemnified by Contractor as stated above, Zero-G agrees to defend, indemnify and hold harmless Contractor and its subcontractors and each of their officers, directors, agents servants and employees (the "**Contractor Indemnities**") from and against all liabilities and reasonable expenses, including but not limited to reasonable expenses of defense (including reasonable legal fees and expenses) and other reasonable expenses, asserted against Contractor or any of its officers, directors, agents, servants or employees for injury to or death of any person or loss of or damage to any property (other than in each case with respect to Contractor or its affiliates or its subcontractors or any of their officers, directors, agents, servants or employees, the liabilities and expenses of which shall be the sole responsibility of Contractor), arising out of or in any manner connected with the possession, condition, maintenance, use or operation of the Aircraft, including, without limitation, operation thereof by Contractor's flight crews, occurring prior to the termination or expiration of this Agreement, whether or not such damage shall have occurred during carriage by air provided, however, that in no event shall the foregoing indemnity extend, and Zero Gravity shall have no liability in respect of (i) breach by Contractor of any obligation, covenant, representation or warranty in this Agreement (ii) any claim to the extent arising as a direct or indirect result of the negligence or willful misconduct of Contractor..

(C)    Claims Procedure. Contractor shall promptly notify Zero-G of any claim as to which indemnification is sought from Zero-G or any of its insurers. Subject to the rights of insurers under policies of insurance maintained pursuant to this Agreement, Zero-G shall have the sole right to investigate and the right in its sole discretion to defend or compromise any claim for which indemnification is sought under Section XI(B), and Contractor shall cooperate, and Contractor shall cause each of the Contractor Indemnities to cooperate, with all reasonable requests of Zero-G or its insurers in connection therewith. Where Zero-G or the insurers under a policy of insurance maintained by or on behalf of Zero-G undertake the defense with respect to a claim, no additional legal fees or expenses of any Contractor Indemnitee in connection with the defense of such claim shall be indemnified hereunder unless such fees or expenses were incurred expressly at the request of Zero-G. Subject to the requirements of any policy of insurance, Contractor or any other Contractor Indemnitee may participate at its own expense in any judicial proceeding controlled by Zero-G or its insurers pursuant to the preceding provisions; provided, that such party's participation does not, in the opinion of Zero-G or any or its insurers, interfere with such proceeding or control.

(D)    Cooperation. In the case of any claim indemnified by Zero-G hereunder, Contractor agrees to cooperate, and to cause each of the Contractor Indemnities to cooperate, with Zero-G and the insurers as any of them may reasonably request in the exercise of their

rights to investigate, defend or compromise any such claim or as may be required to retain the benefits of such insurance with respect to any such claim.

        (E)   <u>Subrogation</u>. Except provided in Section V(C)(1)a. above, Zero-G or its insurers, or both, as the case may be, shall be subrogated to the rights and remedies of Contractor and each other Contractor Indemnitee on whose behalf any such claim was paid or for which indemnification is otherwise sought with respect to the condition or event giving rise to such claim. Should Contractor or any other contractor Indemnitee receive any refund, in whole or in part, with respect to any claim paid by Zero-G or its insurers hereunder, Contractor shall promptly pay the amount refunded over to Zero-G or its insurers, as Zero-G may direct, together with interest thereon at a per annum rate equal to 10% per annum form and including the date of receipt to and excluding the date paid to Zero-G.

## X.    **MISCELLANEOUS**

        (A)   <u>Notices</u>.  All notices, requests, demands, and other communications, under this Agreement, shall be in writing and sent by U.S. Registered Mail, postage prepaid, receipt requested, or by courier service, and shall be deemed to have been duly given as of the date indicated on the return receipt card mailed to the party to whom notice is given or as of the date indicated on the delivery receipt of the courier, and properly addressed as follows:

        To Zero-G:        4175 South Cameron Street, Suite B
                              Las Vegas, NV  89103
                              (702 247-4085
                              Attention: David Cacci, President

                              and

                              Roland H. Moore, Esq.
                              1221 Brickell Avenue, Suite 2660
                              Miami, Florida 33131

        To Contractor:        Amerijet International, Inc.
                              2800 S. Andrews Avenue
                              Fort Lauderdale, FL  33316
                              Attention:  President

                              and

                              Kluger, Peretz, Kaplan & Berlin, P.L.
                              Miami Center, 17th Floor
                              201 South Biscayne Boulevard
                              Miami, Florida 33131
                              Attention:  Steven I. Peretz, Esq.

Any party may change its address for the purposes of this Section by giving the other party written notice of the new address in the manner set forth above.

(B)  Validity, Waiver.  In the event that any provisions of this Agreement shall be held to be invalid, the same shall not affect in any respect whatsoever the validity of the remainder of this Agreement:. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

(C)  Governing Law, Gender, Headings.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA and the United States of America (excluding any conflict- of-law rule or principal).  The parties agree that any state or Federal court located in the State of Florida shall have non-exclusive jurisdiction to hear any suit, action or proceeding arising out of or in connection with this Agreement. as used in this agreement, the masculine, feminine or neuter gender, and the singular and plural number shall each be deemed to include the others whenever the context so indicates. Section headings contained in this Agreement are for convenience only, and shall not be considered for any purpose in construing this Agreement.

(D)  Attorney's Fees.  In the, event of a dispute between the parties arising out of the terms, conditions, and obligations imposed by this Agreement, the prevailing party in such dispute shall be entitled to recover reasonable attorney's fees, costs and expenses incurred in connection therewith.

(E)  Successors and Assigns. THIS AGREEMENT AND THE VARIOUS RIGHTS AND OBLIGATIONS HEREUNDER SHALL INURE TO THE BENEFIT OF AND BE BINDING UPON THE PARTIES HERETO AND THEIR RESPECTIVE SUCCESSORS AND PERMITTED ASSIGNS. CONTRACTOR ACKNOWLEDGES THAT THIS AGREEMENT IS A PERSONAL SERVICES CONTRACT AND NEITHER THIS AGREEMENT NOR ANY OF CONTRACTOR'S RIGHTS OR OBLIGATIONS HEREUNDER MAY BE ASSIGNED OR DELEGATED BY CONTRACTOR WITHOUT THE PRIOR WRITTEN CONSENT OF ZERO-G.

(F)  Non-Disclosure and Confidentiality. Contractor and Zero-G agree to keep confidential such information as Contractor and Zero-G may from time to time impart to each other regarding their business affairs, including but not limited to this Agreement, and Contractor or Zero-G will not in whole or in part, now or at any time, disclose said information or this Agreement, during the term of this Agreement, except in each case to a Person who is or would be permitted assignee if such Person agrees in writing to be bound by this Section or to professional advisors which are under a duty to maintain the confidentiality hereof or as may be required by law or legal process.

(G)  Entire Agreement, Etc.  This Agreement represents the entire agreement between the parties with respect to the subject matter hereof, superseding all prior inconsistent agreements, and no oral agreements have been made. This Agreement may be executed in one or more separate counterparts, each of which, when so executed, shall be deemed to be an original. Such counterparts shall, together, constitute and be one and the same instrument. The

Appendices attached hereto are incorporated herein by this reference and shall for the purpose of this Agreement be deemed to be a part hereof. This Agreement can be modified only in writing and such modification must be signed by the parties hereto before it shall become effective.

      (H)    <u>Force Majeure</u>.  Except as provided herein, each party hereto will be excused from performance under this Agreement by the other as a result of any event of force majeure, including, but not limited to, acts of any government or subdivision thereof, the improper failure or refusal of any government or governmental agency to issue necessary permits or operating authorities, acts of God, weather damage or destruction of flight equipment, lack of fuel availability at airports to be used, riots or civil commotions, strikes or labor stoppage, military emergency, war or hazards of damages incident to the state of war, or any other causes which is beyond the control of either party and which prevents either party from performing this Agreement, so long as in each case such event of force majeure or other cause beyond the control of such party is not caused by such party's breach of this Agreement or negligence or willful misconduct; provided, however, that circumstances within contractor's reasonable control shall include, but are not limited to, circumstances related to Contractor's financial condition or sickness, absenteeism, tardiness, strikes or labor stoppages by employees of Contractor, or a grounding or unavailability of any of the Aircraft for mechanical reasons, other than internal engine damage or deterioration, or the unavailability of flight crews, other than additional crews required due to temporary scheduling changes made by Zero-G, or inability to provide services hereunder or grounding of any of the Aircraft by the Aeronautics Authority due to reasons arising out of Contractor's operating procedures or its failure to maintain in full force and effect its FAR Part 121 authority and Section 401 or 418 certification. Contractor shall use its best efforts to eliminate or mitigate any adverse affect on the performance of its obligations hereunder resulting from force majeure or other circumstances beyond its control.

      (I)    <u>Non-Exclusive Agreement</u>.  Nothing in this Agreement is intended to or shall require Zero-G to utilize the services or facilities of the Contractor in Zero-G's business to the exclusion of others.

      (J)    <u>Rights Cumulative</u>.  All rights and remedies from time to time conferred upon or reserved to Zero-G are cumulative, and none is intended to be exclusive of another. No delay or omission in insisting upon the strict observance or performance of any provision of this Agreement, or in exercising any right or remedy shall be construed as a waiver or relinquishment of such provision, nor shall it impair such right or remedy. Every right and remedy may be exercised from time to time and as often as deemed expedient.

      (K)    <u>Survival</u>.  All indemnities by Contractor or Zero-G contained in this Agreement shall survive the expiration or other termination of this Agreement.

## XI.   <u>CERTIFICATION</u>

      The parties have each caused this Agreement to be executed on the day mentioned at the beginning of this Agreement. The individual signing on behalf of the corporate party certifies that he or she is duly authorized to make this Agreement binding for and on behalf of that corporation.

**IN WITNESS WHEREOF,** the parties hereto have entered into this Agreement as of the date and date first above written.

**ZERO GRAVITY CORPORATION**                    **AMERIJET INTERNATIONAL, INC.**

By: _____                     By: _____

Name: _PETER H DIAMANDIS_                        Name: _DAVID G BASSET_

Title: _CEO_                                     Title: _PRESIDENT_

## APPENDIX – A

### Charter Terms of Substitute/Replacement Aircraft

**Amerijet agrees to continue making N994AJ available to ZERO-G for weekend use, and as a backup to N794AJ, under the terms of the current Parabolic Flight Agreement.**

## APPENDIX-B

## Estimate of Expenses

Section 2(a)
Section 2(b)
Section 2(l)
Section 2(m)
Section 2(n)

## AIRCRAFT ENGINE LEASE AGREEMENT

**THIS AIRCRAFT ENGINE LEASE AGREEMENT** (this "**Lease**") is made and entered into effective this __30th__ day of March, 2007 (the "**Effective Date**") by and between **AMERIJET INTERNATIONAL, INC.**, a Florida corporation ("**Lessor**"), having its address at 2800 South Andrews Avenue, Fort Lauderdale, Florida 33136. and **ZERO GRAVITY CORPORATION**, a Maryland corporation ("**Lessee**") having its address at 4175 South Cameron Street, Suite B, Las Vegas, Nevada 89103 (Lessor and Lessee may be referred to herein individually, as a "**party**" and collectively, as "**parties**").

### RECITALS

WHEREAS, Lessor owns a Boeing 727-200 aircraft airframe (the "**Airframe**");

WHEREAS, Lessor has leased the Airframe to Lessee pursuant to the Aircraft Lease Agreement, dated November 16, 2006 (the "**Airframe Lease Agreement**");

WHEREAS, Lessor has agreed to provide management services to Lessee pursuant to an Aircraft Management Services Agreement with Lessee, dated November 16, 2006 (the "**Management Agreement**"); and

WHEREAS, Lessor desires to lease three (3) engines to Lessee for use on the Airframe on the terms and conditions set forth herein;

**NOW, THEREFORE,** In consideration of the mutual promises and covenants set forth below, the parties hereto agree as follows:

### AGREEMENT

1.    **RECITALS.**  The recitals are true and correct and incorporated herein by reference.

2.    **DESCRIPTION OF ENGINES.**  This Lease covers the following described aircraft engines and any substitutions or replacements therefor, as provided herein (the "**Engines**"):

      **Pratt Whitney JT8D**

| | |
|---|---|
| Engine 1: | [_688675-15_] |
| Engine 2: | [_665525-9A_] |
| Engine 3: | [_654843-17_] |



3. **TERM.** The term of this Lease shall be for a period commencing on the Effective Date and expiring upon expiration or termination of the Airframe Lease Agreement (the "**Term**"), unless earlier terminated as provided for herein.

4. **RENT.** Lessee agrees to pay Lessor as rent for the use of the Engines a monthly rent of            for each Engine (totaling            per month for all of the Engines). Lessee shall make monthly rental payments commencing on the Effective Date, and each subsequent monthly installment becoming due and payable on each monthly anniversary thereafter. All rent and other payments hereunder shall be paid to Lessor by wire transfer to Lessor's bank account,                                      or to such other bank account as Lessor may from time to time designate upon not less than ten (10) days' prior written notice to Lessee.

5. **EXPIRATION OF LEASE AND RETURN OF ENGINES.** At the expiration of the Term, the Engines shall be returned to Lessor in the same condition, wear and tear excepted.

6. **TITLE TO ENGINES.** Title to and ownership of the Engines shall be and remain in Lessor at all times throughout the term of this Lease. Lessee shall have no right, title or interest in or to the Engines except the right to possession and use thereof during the term of this Lease, subject to the terms and conditions herein contained. At all times during the term of this Lease, Lessee shall maintain in the Engines log books, a copy of this Lease and any other documents which may be required by the United States Federal Aviation Administration ("**FAA**") and any other applicable governmental authority.

7. **DELIVERY.** Lessor shall tender delivery of the Engines on the Effective Date. The Engines shall be operational when delivered. Lessee shall have the right to conduct an inspection of the Engines, and its records to ensure that the Engines fully meet Lessee's delivery requirements.

8. **SOLE USE.** Lessee covenants and agrees that the Engines shall be used solely on the Airframe.

9. **VALUE OF ENGINES.** The "**Stipulated Loss Value**" of each Engine throughout the term of this Lease shall be $

10. **ACCEPTANCE.** On the Effective Date, Lessee shall accept delivery of the Engines by delivering to Lessor's authorized representative a Certificate of Acceptance executed by Lessee's authorized representative in the form attached hereto as **Exhibit "A"** attached hereto. Upon delivery to Lessor of the executed Certificate of Acceptance, the Engines shall be subject to all of the terms and conditions of this Lease. Upon Acceptance of the Engines, Lessee shall be deemed conclusively to have acknowledged receipt of delivery of the Engines in good order and condition and to have waived any and all claims arising from defects therein, including, without limitation, any latent or other defects, whether or not discoverable by Lessee or Lessor.

11. **LESSEE'S OBLIGATION UNCONDITIONAL.** The obligation of the Lessee to pay the rent herein described and any additional amounts due and payable Lessor under this Lease shall be absolute and unconditional.

12.   **TAXES AND OTHER GOVERNMENT CHARGES.** The Lessee shall pay, hold harmless and indemnify the Lessor for and against all sales and use taxes, excise taxes, personal property taxes, ad valorem taxes, stamp and documentary taxes, and all other governmental levies, duties, assessments charges, fee, fines or penalties whatsoever, whether imposed upon or payable by Lessor or Lessee, on or relating to the Engines and its equipment, or the lease, rental, delivery, shipment, transportation, registration, use, or occupancy, operation or the return or other disposition thereof, including gross receipts, income or similar taxes imposed upon Lessor with respect to rentals received hereunder (excluding only United States Federal, state and local taxes based upon the net income of Lessor). Lessee shall be responsible for obtaining, maintaining current and renewing all necessary licenses, certificates, and similar' permits for the occupation, use and operation of the Engines, and shall pay all license and other fees and costs in connection with same. All such licenses, certificates and permits shall indicate that ownership of and full legal and beneficial title to the Engines is in Lessor. Lessor shall have the option, but not the obligation, to pay any of the aforementioned taxes, licensing, registration or permit fees, other fines or charges, and in the event that Lessor does so, Lessee shall reimburse Lessor within ten days after receipt of any invoice therefor. Lessee shall provide Lessor with copies of any report or return which it has made with respect to any obligation of Lessee under this **Paragraph 12** as well as evidence of payment for any amounts required to be paid under this **Paragraph 12**. The provisions of this paragraph shall survive the expiration or other termination of this Lease.

13.   **REQUIRED MAINTENANCE AND REPAIRS.**

(a)   **Maintenance.** Lessor will perform all on-wing maintenance of the Engines, as well as heavy maintenance and Engine repair, whether caused by foreign object damage, operational misuse or abuse, or otherwise. All work shall be performed in accordance with Lessor's FAA approved maintenance program. Lessee shall pay Lessor for the cost of maintenance and repairs in accordance with the terms of the Management Agreement.

(b)   **Records.** Lessor shall maintain all records, logs and other materials required pursuant to the Management Agreement.

(c)   **Additional Inspections.** The cost of labor and parts to perform any Airworthiness Directive and all manufacturer's mandatory service bulletins (collectively, "**AD"(s)**) shall be Lessee's responsibility pursuant to the Management Agreement.

(d)   **Repairs, Replacements and Substitutions.** The Engines shall not be removed from the Airframe except for repair or replacement. In addition to replacements, in the case of repair or maintenance, in the sole discretion of Lessor and upon ten (10) days' prior written notice, the Engines may at any time be substituted for other engines with the same specifications. Any replacements or substitutions made shall become and remain the property of Lessor at the expiration or other termination of the Lease, in the same manner as though said replacements or substitutions were

Engines at the time of the commencement of the Term of this Lease. All such replacements and substitutions shall be free and clear of all liens, mortgages and encumbrances, except in the case of replacements temporarily installed on an emergency basis.

14.     **LESSOR'S INSPECTION RIGHTS.**     Lessee agrees that Lessor or its authorized representatives may, upon not less than one (1) Business Day's (as defined in the Management Agreement) written notice and solely at Lessor's discretion, inspect the Engines and its books, logs and records at all reasonable times during the term of this Lease, but Lessor shall have no duty to make any such inspection and shall incur no liability by reason of not making same.

15.     **COMPLIANCE WITH LAWS, ETC.** Lessee warrants that the Engines will be maintained, used, and operated in compliance with all applicable governmental laws, rules, regulations, ordinances, orders and directives and will not be maintained, used, or operated in violation thereof or in violation of any air worthiness certificate or any other certificate, permit, license or registration relating to said Engines. Lessee shall not operate the Engines, nor permit it to be operated in any area or for any purpose excluded from coverage by any insurance policy issued thereon or with respect thereto.

16.     **FILING OF LEASE; EXECUTION OF OTHER DOCUMENTS.** Following the execution and delivery of this Lease, Lessor, at its own expense and in compliance with all applicable laws and regulations, shall file a copy thereof with Flight Standards Technical Division or other appropriate office of the FAA. Upon recordation of this Lease by the FAA, Lessor shall promptly provide Lessee with evidence thereof, including the document recordation number assigned by the FAA and the Lessee shall promptly execute such additional documents and take such further actions as Lessor may from time to time be reasonably requested by a party hereunder to carry out the intents and purposes of this Lease.

17.     **RISK OF LOSS; LESSOR NOT LIABLE.** All risk of loss or damage to the Engines, including without limitation, loss or damage resulting from foreign object damage or operational misuse or abuse shall be borne by Lessee. Lessor shall not be liable to Lessee for any damage to or loss or destruction of the Engines, or for any loss, damage, or expense of any kind or nature caused directly, indirectly, or consequently, by the Engines or the use, maintenance, handling, hangaring or storage thereof, or loads thereon, or to repairs, servicing, or adjustment thereto, or because the same is, or has become, unsuitable or unserviceable, or by an interruption of service or loss of use thereof, or for any loss of business or damage whatsoever or howsoever caused. It is expressly understood and agreed that Lessor assumes no liability for any acts or omissions of Lessee or of Lessee's agents, servants, or employees, or for any property of Lessee or persons in privity with Lessee, damaged, lost or stolen in or from said Engines.

18.     **INDEMNITY.** Except as otherwise provided in the Management Agreement or the Airframe Lease Agreement, Lessee assumes direct liability for and agrees to protect, defend, indemnify and otherwise hold harmless Lessor, its officers, directors, employees, agents, owners and assigns from and against, and to pay Lessor upon demand the amount of any suits, claims, complaints, damages, penalties, fines, expenses, costs and losses, including legal expenses, of whatsoever kind and nature, imposed upon, incurred by or asserted against Lessor (whether or



not subject to indemnification by any seller or manufacturer of the Engines) in any way related to or arising from the execution, enforcement or performance of this Lease, including, but not limited to, the manufacture, purchase, inspection, acceptance, use, operation, maintenance, or storage of the Engines except to the extent caused by the Lessor's negligence or willful misconduct.

19.     **INSURANCE.**   Without limitation of any obligation of the Lessee under this Lease, the Lessee shall, as provided in the Management Agreement, either obtain and maintain in full force and effect for the full term of this Lease or reimburse Lessor for the policies of insurance set forth in the Management Agreement.

20.     **PROCEDURE UPON LOSS OR DAMAGE TO ENGINES.**   In the event of loss or damage to the Engines, Lessee shall promptly report such loss or damage to the appropriate insurance company or companies, to the Lessor and to all concerned Federal or state, local or other governmental agencies, and shall furnish such information and execute such documents as may be necessary or required for Lessor, to collect the proceeds of all applicable insurance policies.  The rights and liabilities of the parties shall be as follows:

(a)     If the Engines are lost or damaged beyond repair, the net proceeds of said policies shall be payable to the Lessor, as sole loss payee and the Lessor, shall have exclusive right to negotiate any settlement with insurers, insurer representatives and duly appointed adjusters, including any and all salvage opportunities.  In addition, the Lessee shall have all responsibility for any applicable deductible.  Lessee as their respective interests may appear, as follows:

Lessor shall receive the Stipulated Loss Value of the Engines (calculated pursuant to **Paragraph. 9**) as of the date of loss or damage, plus interest on the total aforesaid sum at a nominal monthly rate of ten percent (10%) from the date of loss or damage until such date as Lessor, receive such sum plus interest in full.  All sums in excess of said amount shall be refunded to Lessee after deduction of all costs and expenses (including court costs and attorneys' fees) incurred by Lessor to collect said amounts.

(b)     If the Engines are only partially damaged, then this Lease shall remain in full force and effect, and the net insurance proceeds shall be applied to the repair of the Engines.  Lessee shall arrange for the Engines to be fully repaired so as to place it in the same condition as it was in before said damage and shall cause said repairs to be accomplished.  Lessee shall bear the cost of such repairs to the extent that such cost exceeds the net insurance proceeds collected.

(c)     No settlement of any insurance claim shall be made in any event without the prior written consent thereto of the Lessor. Lessee hereby appoints Lessor and Lessor's designees, if any, as Lessee's attorney-in-fact to make any claim for, receive payment for, and execute and endorse all documents, checks or other instruments in payment for loss or damage



under any such insurance policy with respect to any loss or damage to said Engines.

21. **PROHIBITION AGAINST SUBLEASE, ASSIGNMENT, OR CREATION OF LIEN.** Lessee shall not sublet, mortgage, pledge, sell or otherwise encumber or dispose of the Engines, nor assign or transfer this Lease or any interest therein, except upon sixty (60) days notice to and with the express written consent of Lessor which consent shall not be unreasonably withheld, and any attempt by the Lessee to do any of the foregoing shall be void and of no effect. If Lessee shall fail to make timely payment for any fuels, parts, materials, supplies or services furnished to or for the Engines, or for labor performed thereon, Lessor may do so and charge Lessee the cost thereof, which shall be due and payable by the Lessee to Lessor immediately upon Lessee's receipt from Lessor of written demand for such payment.

22. **NOTICE OF LITIGATION.** In the event that the Engines, or the use, operation, transportation, storage, repair or maintenance thereof, or any other activity pertaining thereto, or any fee or charge for any of the foregoing becomes the subject of or is otherwise connected with any litigation, whether or not Lessee is a party to such litigation, Lessee shall promptly give notice and details of such litigation to Lessor, and shall thereafter keep Lessor advised as to the progress of such litigation.

23. **ENGINE MODIFICATIONS.** Lessee warrants that it will not cause any modification or alteration to the Engines, without Lessor's prior written consent, which consent may be withheld at Lessor's sole discretion.

24. **DEFAULT.** The occurrence of any of the following events or conditions shall constitute an event of default hereunder after fifteen (15) days' written notice by Lessor to Lessee, except for default in **Paragraph 24(a)** in which case such default remains uncured, with or without notice for five (5) Business Days (as defined in the Management Agreement) provided Lessee shall have the right to cure during any applicable Notice Period:

    (a)    failure of the Lessee to pay when due any rental installment or any other payment which may be required hereunder;

    (b)    any material breach or failure of Lessee to observe or perform any other term, condition or covenant required to be observed or performed by the Lessee hereunder;

    (c)    any material breach of any warranty, or falsity of any material representation, made by Lessee in connection with this Lease;

    (d)    a material default by Lessee under the Management Agreement or the Airframe Lease Agreement;

    (e)    the dissolution, liquidation, cessation of business, or termination of existence of Lessee hereto;

    (f)    the insolvency or bankruptcy of Lessee, or the making by Lessee of an assignment for the benefit of creditors, or the consent of the Lessee to the

appointment of a trustee or receiver for Lessee or for a substantial part of its property, or the appointment with or without Lessee's consent of a trustee or receiver for Lessee for a substantial part of its property, or the admission in writing by Lessee of its inability to pay its debts as they may mature;

(g)     the voluntary assignment or transfer by Lessee of its interest as Lessee hereunder (in a manner or to a person not permitted by the terms hereof) of all or substantially all of its property;

(h)     the institution by or against Lessee of bankruptcy, reorganization, arrangement, insolvency, or liquidation proceedings, or any other proceedings for relief under any bankruptcy or similar Federal, state or local law for the relief of debtors, provided that such proceedings are allowed or are consented to by Lessee, or are not dismissed within sixty (60) days after such institution;

(i)     the loss, theft, substantial damage to or destruction of the Engines (unless otherwise adequately covered by insurance), or the sale, encumbrance, concealment, removal, attachment, seizure, forfeiture of or levy upon the Aircraft; or

(j)     receipt by Lessor of a Notice of Cancellation of any insurance policy on the Aircraft followed by the failure of Lessee to replace or renew such policy before the fifteenth (15th) Business Day (as defined in the Management Agreement) prior to the effective date of such cancellation.

25.     **LESSOR'S REMEDIES FOR DEFAULT.** Upon the occurrence of an event of default, the Lessor, at its sole option and without notice to or demand upon the Lessee, may exercise, individually or severally, the following remedies:

(a)     Lessor may proceed by appropriate court action or actions, at law or in equity, to enforce specific performance by the Lessee of the application covenants, conditions and terms of this Lease and to recover damages for breach thereof.

(b)     Lessor may declare the entire unpaid amount of the total term rental hereunder due and payable, whereupon the same shall become immediately due and payable.

(c)     Lessor may forthwith terminate this Lease, whereupon all of Lessee's rights and interest in and to the possession and use of the Engines shall terminate. In the event that it exercises the remedy provided under this **Paragraph 25**, Lessor:

(i)     shall be entitled to retain all rents and additional sums theretofore paid by the Lessee hereunder and received by the Lessor, including any such sum then in Lessor's possession which, had this Lease not

been terminated, would otherwise be payable to the Lessee hereunder; and,

(ii) shall be entitled, but not obligated, (A) to relet the Engines for such rentals and upon such terms as Lessor shall elect, or (B) to sell the Engines at public or private sale, with or without notice of Lessee, either for cash or upon credit; and,

(iii) shall in addition to all or any rights and remedies hereunder be entitled to recover from the Lessee as liquidated damages but not as a penalty for the breach of this Lease, and as reasonable rent for the use of the Engines or such part hereof and for the depreciation thereof, the amount by which the proceeds of such lease, sale or other disposition (less expenses of retaking, storage, repairing and lease, sale or other disposition, and reasonable attorney's fees incurred by Lessor) is less than the sum of (A) all due and unpaid rent for the Engines, (B) the Stipulated Loss Value on the date of such termination or repossession, (C) an amount equal to accrued taxes and other amount payable hereunder by Lessee with respect to the Engines or such part thereof, (D) all costs, expenses, losses and damages incurred or sustained by Lessor by reason of any default hereunder, and (E) interest at the maximum lawful rate, or 1.5% per month, whichever is less, on each of the foregoing and on all sums not paid when due under such provision of this Lease. If on the date of such termination or repossession the Engines or any. part thereof be damaged, lost, stolen, or destroyed, or be subject to any levy, seizure, assignment, application or sale for or by any creditor or governmental agency, Lessee shall also remain liable for the Stipulated Loss Value pertaining to the Engines or such part thereof, less the amount of any insurance recovery received by Lessor in connection therewith.

(d) The Lessor may pursue and enforce any and all other remedies available in its favor under any other provisions of this Lease or existing at law, in equity or in bankruptcy.

(e) The Lessor's remedies provided hereunder are cumulative and not exclusive and shall be in addition to any and all other remedies provided, existing or available in its favor under any other provisions of this Lease, at law, in equity or in bankruptcy. Lessor's remedies may be exercised concurrently or separately, and the exercise of one remedy shall not be deemed to be an election of such remedy or to preclude the exercise of any other remedy. Without limiting the foregoing, and in addition to any other remedy it may choose to pursue, the Lessor shall be entitled to recover from the Lessee any and all damages which the Lessor shall sustain by reason of the Lessee's breach of any of the covenants and terms of this Lease, together with a reasonable sum for attorney's fees and such expense

as may be expended or incurred in the seizure, rental, or sale of the Engines, or in the enforcement of any right or privilege hereunder, or in any judicial action (including appeals) in connection with such breach.

26. **LESSOR MAY ASSIGN AND ENCUMBER.** Lessor reserves the right both prior and subsequent to the Effective Date of this Lease, to encumber the Engines with chattel mortgages or other security agreements which shall constitute rights superior to those created by or arising under the terms of this Lease. Lessor's right, title and interest in and to this Lease and the Engine may be transferred and assigned by Lessor without notice to Lessee. In such event, Lessor's assignee shall have all of the rights, powers, privileges and remedies of Lessor hereunder. Lessee shall not be entitled to terminate or amend this Lease without the written consent of such assignee and Lessee agrees unconditionally, upon receipt of notice of such assignment, to pay to said assignee, at the address of assignee provided to Lessee, the rentals and all other sums due hereunder, at the times specified herein. Any such assignment shall not relieve Lessor of any of its obligations to Lessee hereunder and shall not be construed as being an assumption of such obligations by such assignee. Assignee's rights shall be free from all claims, defense, set-offs or counterclaims which Lessee may be entitled to assert against Lessor. Notwithstanding such assignment, Lessee may claim separately against Lessor as to matters which Lessee may be entitled to assert under this Lease.

27. **VENUE.** All legal actions arising from this Lease shall be brought before a court of competent jurisdiction in Broward County, Florida. Both parties hereby consent to such jurisdiction and venue.

28. **TIME OF THE ESSENCE.** Time is of the essence under this Lease. The failure of the Lessor to insist in anyone or more instances upon strict performance of any covenant of this Lease (including, but not limited to, the timely payment of rent), or to exercise any option or right herein contained, shall not be construed as a future waiver or relinquishment of such right, covenant or option. The Lessor's collection of rent subsequent to the Lessee's breach of any covenant contained in this Lease shall not constitute a waiver of such breach.

29. **BINDING ON SUCCESSORS.** This Lease shall be binding upon and inure to the benefit of the respective individual and/or corporate parties, and the respective successors and assigns.

30. **NOTICES.** Notices hereunder shall be sent to the addresses and in the manner set forth in the Management Agreement.

31. **GOVERNING LAW, SEVERABILITY AND CONSTRUCTION OF THE LEASE.** This Lease shall be construed in accordance with the law of the United States of America and the State of Florida. To the extent permitted by applicable law, Lessee hereby waives its rights under any provision of law which rendered any provision hereof nugatory or unenforceable in any respect. Otherwise, any provision of this Lease which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidation of any of the remaining provisions hereof, and such provision in any other jurisdiction. Lessor's failure at any time to require strict and timely performance by Lessee of any of the provisions of this Lease shall not waive,



diminish or otherwise prejudice Lessor's right thereafter to demand strict compliance therewith or with any other provisions of this Lease.

32. **ENTIRE AGREEMENT; LIMITATION OF LESSOR'S WARRANTIES.** This Lease, together with the Management Agreement and Airframe Lease Agreement, represent the entire agreement between the parties with respect to the lease of the Engines. Any modification of or amendment to this Lease shall be executed in writing and signed by the parties hereto. No representations, warranties, promises, guarantees, undertakings or agreements, oral or written, express or implied, have been made by the parties hereto with respect to this Lease or the Engines except as expressly stated herein. PARTICULARLY, AND WITHOUT LIMITATION OF THE FOREGOING, LESSOR MAKES NO WARRANTY AS TO THE CONDITION OF THE ENGINES OR ANY ITEM OR EQUIPMENT THEREON, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE, OR THE FREEDOM THEREOF FROM LIENS, ENCUMBRANCES OR RIGHTS OF OTHERS. LESSEE ACKNOWLEDGES THAT IT IS ACCEPTING THE ENGINES IN AN "AS IS/WHERE IS" CONDITION.

33. **EXHIBITS.** The exhibit attached hereto and made a part hereof and is incorporated herein by reference.

34. **AMENDMENT TO OTHER AGREEMENTS.** The Management Agreement is hereby amended so that the term "Lease Agreement" as used therein shall be deemed to refer to both the Airframe Lease Agreement and/or this Lease. **Paragraph 24(d)** of the Airframe Lease Agreement is hereby amended to read in its entirety as follows: "(d) a default by Lessee under the Management Agreement or the Aircraft Engine Lease Agreement dated March 30, 2007 between Lessee and Lessor."

35. **CONFLICT.** In the event of a conflict between the terms of this Lease and the Management Agreement and/or the Airframe Lease Agreement, this Lease shall control.

**[Intentionally left blank]**

*[SIGNATURES ON FOLLOWING PAGE]*



IN WITNESS WHEREOF, the parties have caused this Lease to be executed as of the date first above written.

**AMERIJET INTERNATIONAL, INC.**

By: _____

Name:  David Bassett

Title:  President, CEO

STATE OF FLORIDA      )
                           ) ss

COUNTY OF BROWARD)

On  March 30th_____, 2007, before me, notary public, personally appeared David Bassett_, to me personally known, who, being by me duly sworn, did say that he/she is President. CEO of Amerijet International, Inc., a Florida corporation and executed said instrument on behalf of said corporation and did acknowledge said instrument to be the free act and deed of said corporation.

[Notary Seal]

My Commission Expires:_ June 1, 2008____

**ZERO GRAVITY CORPORATION**

By:_____
Name:
Title:

STATE OF _____ )
                             ) ss:

COUNTY OF _____)

On  _____, 2007, before me, notary public, personally appeared _____, to me personally known, who, being by me duly sworn, did say that he/she is _____ of Zero Gravity Corporation, a Maryland corporation and executed said instrument on behalf of said corporation and did acknowledge said instrument to be the free act and deed of said corporation.

[Notary Seal]

My Commission Expires:_____

## EXHIBIT "A"

## DELIVERY AND ACCEPTANCE RECEIPT

This acknowledges full and satisfactory delivery and acceptance of the following Engines (the "**Engines**").

> Manufacturer and Model
> Registration Number
> Manufacturer's Serial Number

The Engines referred to above were received by us on the date and at the location set forth below and was determined by us to be in good order and condition and acceptable to us.

IN WITNESS WHEREOF, this instrument has been duly signed by the undersigned authorized party.

**LESSEE:**

**ZERO GRAVITY CORPORATION**

By: _____
Name:
Title: