United States District Court  Southern District of Texas

United States District Court
Southern District of Texas
**ENTERED**
April 16, 2018
David J. Bradley, Clerk

Amerijet International, Inc., §
　　　　　　　　　　　　　　§
　　　　　Plaintiff, §
　　　　　　　　　　　　　　§
versus §　　Civil Action H-15-791
　　　　　　　　　　　　　　§
Zero Gravity Corporation, §
　　　　　　　　　　　　　　§
　　　　　Defendant. §

# Findings and Conclusions

1. *Background.*

Byron Lichtenburg founded Zero Gravity Corporation to offer flights that would reduce the effects of gravity on passengers by flying in parabolas. To that end, it hired Amerijet International, Inc., a cargo airline with a Boeing 727 that it could modify for parabolic flight.

Zero Gravity and Amerijet entered into the Management Services Agreement in November of 2006. Zero Gravity would lease and eventually buy the 727, and Amerijet would operate the flights and maintain the aircraft. In 2011, Zero Gravity bought the 727 from Amerijet. The initial term of the agreement expired that year, and it became a month-to-month contract. Either party could terminate it by giving 30 days' notice.

Eventually, the relationship between the two companies soured. In 2012 and 2013, several maintenance problems grounded the aircraft, and Zero Gravity had to cancel parabolic flights.

In April of 2014, Amerijet told Zero Gravity that it was terminating the agreement, effective May 4, 2014. Amerijet was supposed to give Zero Gravity the maintenance records for the aircraft. On May 22, it gave Zero Gravity the formal records it kept for the Federal Aviation Administration but not the informal records.

Zero Gravity had been leasing engines from Amerijet. It offered to extend the engine lease, but Zero Gravity declined. Amerijet removed its engines.

Zero Gravity found a new operator – Everts Air Cargo. Zero Gravity and Everts negotiated that spring and summer. They had a letter of intent but not a contract by July 18, 2014.

One source of business for Zero Gravity was the National Aeronautics and Space Administration. NASA was planning to have four "flight weeks" in the summer of 2014. Originally, Zero Gravity and Amerijet were going to run them. After they ended their relationship, Zero Gravity wanted to fly but NASA decided that it was not prepared and cancelled the flights. At the end of July, NASA audited Everts and it, deciding not to have them as contractors anymore. NASA did an August flight week with its own aircraft, then started to furnish grants for parabolic flights instead.

2. *Unpaid Invoices.*

Zero Gravity has invoices from Amerijet that it has not yet paid. Neither disputes that Zero Gravity owes Amerijet $150,318.25. However, approximately $30,000 is in dispute.

Amerijet asked for $10,452 for removing its engines from the 727. The engines belonged to Amerijet, and it had to remove them because Zero Gravity no longer leased them. Zero Gravity would eventually need to put other engines on the airplane.

Amerijet did not approach the engine removal with tact. Although it knew perfectly well where and how to find Zero Gravity, it petitioned a Texas state court for an *ex parte* temporary restraining order and snuck into the hangar to remove the engines. Amerijet will not recover the cost of engine removal. That cost was its from the beginning.

Amerijet has also asked for $14,856 for the spare parts it kept in the fly-away kit that Zero Gravity took along with the plane. The two had agreed that Zero Gravity would pay for a spare part only when it was actually used. Spare parts are not part of the aircraft. Similarly, spare parts left on a ship by the repair

company in case a repair was needed were not part of the ship.[1] Also, the 2011 lease of the 727 from Zero Gravity to Amerijet said that ordinary aircraft spare parts — not the sort made specifically for parabolic flight — were not included in the lease. Amerijet will recover $14,856.

Approximately $10,000 in disputed travel costs remain. These include the costs of sending people to remove the engines — a cost that belongs to Amerijet — and sending extra people to the location of a parabolic flight. Amerijet says that it had to send its people early because the upcoming flight immediately followed a holiday weekend. Zero Gravity says that it does not have to pay for the early-arrival expenses. Neither party effectively explained these costs, but the burden was Amerijet's. Amerijet will not recover these costs.

3. *Manuals.*

Like all 727s, this one came with a set of manuals from Boeing. Each operator of the aircraft must purchase a new set of manuals directly from Boeing so Boeing can ensure its safety and accuracy. Amerijet had a set. When Everts became the operator, it purchased its own set.

Unlike other 727s, this aircraft was modified for parabolic flight. Several people had developed manuals specifically for the parabolic part of the flight based on their understanding of parabolic flight and their observations of this aircraft. Amerijet says that these manuals belong to it and were not sold with the 727.

The people who put together the parabolic-flight manuals were paid by Amerijet and Zero Gravity. Zero Gravity had paid, in part, for their creation. The manuals were, like a diving bell and an air pump to a pearl-fishing vessel, necessary for the purpose of the flight.[2] They were made for this airplane and designed specifically for its unusual purpose of flying in parabolas to reduce the effects of gravity. Also, the bill of sale says that "all available records" were sold.

---

[1] *Kawasaki Heavy Industries, Ltd. v. M.V. Sorrento*, 1982 A.M.C. 2990 (E.D.Va. 1982).

[2] *See The Witch Queen*, 30 F. Cas. 396 (D. Cal. 1874).

The manuals are the result of analyzing the records. They are their summary and their application. The parabolic-flight manuals were sold with the 727.

4.  *Interference.*

Amerijet did not interfere with Zero Gravity's NASA contract. It might have been interested in doing parabolic flights on its own. It sent an email to NASA to test the possibility, but when NASA responded without interest, Amerijet dropped it.

NASA did not want to continue the program. It ran its own flights briefly, then it started using grants to let its people take parabolic flights with companies of their choice. Nothing shows that Amerijet's not giving Zero Gravity the data caused NASA to drop Zero Gravity. By July 30, 2014, NASA was no longer interested in contractor flights. It flew some of its own flights, then stopped. It still does not have a contractor for parabolic flights.

5.  *Records.*

Zero Gravity claims that Amerijet breached the bill of sale by not giving it all of its records. Amerijet says that it gave Zero Gravity the hard-copy formal records required by Federal Aviation Administration regulations.

On May 22, 2014, after a one-week delay, Amerijet gave Zero Gravity its hard-copy records. An Amerijet operations manager erased electronic records from the computer on board the 727 when Zero Gravity was set to take the airplane away. On July 1, by this court's order, Amerijet gave Zero Gravity its electronic records.

The bill of sale said that Amerijet was to give Zero Gravity "all available records." Amerijet might have complied with the regulations, but it did not fulfill its contractual obligation. It breached the bill of sale.

Zero Gravity has asked for its anticipated profits from the NASA flight weeks it missed in June, July, and August of 2014. The effects of Amerijet's not giving the records reach only so far. Zero Gravity was ill-prepared for the NASA flight weeks by its own doing.

Zero Gravity and Everts needed to pass a NASA audit to fly. They needed to get manuals directly from Boeing. They needed to have engines on the 727.

Everts ordered the manuals at the end of June; they arrived in mid-July. Zero Gravity says that it was in talks to lease engines and that, if everything else was ready to go, it could have signed the lease and received the engines later. Zero Gravity had not signed a contract with Everts. They had a letter of intent.

NASA audited Zero Gravity from July 23 to 25 and concluded that Zero Gravity and Everts were not ready to fly. One problem was that they did not have a contract. Informally, Zero Gravity's NASA contact had said that he thought the letter of intent would suffice, but NASA decided that it would not. The same contact said that Zero Gravity might have passed the audit if it had a few more weeks. That is a gentle rejection, not a technical conclusion.

It may not recover for the June and July flight weeks. Although it did not have all of the records, it had the records that Amerijet kept for the FAA. Also, it had not taken the necessary steps to prepare itself for these flights. It did not order the Boeing manuals until the end of June, so they arrived in mid-July. It had not yet been audited by NASA, and it had not signed its contract with Everts.

By the end of July, NASA had no interest in having a contractor run these flights. The August flight week will not be included in the damages.

6.   *Breach of Management Services Agreement.*

Amerijet agreed to maintain the aircraft as would "a prudent international air carrier." On June 2, 2012, February 10, 2013, April 24, 2013, and May 18, 2013, engine problems grounded flights. In December of 2013, an anti-icing duct problem grounded the airplane. Amerijet had already seen similar problems in its fleet but had not inspected its 727s. The constant speed drives also malfunctioned, keeping the airplane grounded.

On one of these occasions, in October 2013, Amerijet missed the last opportunity of the day to send a replacement drive counter-to-counter because it was trying to repair the drive. Although attempting a repair before replacing the drive was a logical first step, having one delivered while repairing the other

would have been a more prudent decision. Amerijet would have had two options, and Zero Gravity and it could have flown.

The airplane had too many problems in too short a period of time. Many of the problems could have been prevented with more thorough inspection and greater forethought.

Zero Gravity has requested its lost revenue and the expenses incurred from cancelled flights. It reimbursed some of its customers, so for those cases, the court accepted the lost revenue at the contract rate. Sometimes Zero Gravity kept the up-front payment and issued vouchers for later flights. Not all of the voucher recipients return. Therese Brewster estimated that 75% of them return. To account somewhat for rounding errors and the discount value of losing revenue on those seats later in time, the court assumes that 70% of them return. Zero Gravity will recover $161,857.45 for the June 2012 engine problem, $226,718.06 for the June to August 2012 drive problems, $204,208.18 for the February 2013 engine problem, $135,569.24 for the April to May 2013 engine problems, $149,142.19 for the October 2013 drive problem, and $289,796.46 for the December 2013 anti-icing duct problem.

7. Conclusion.

Zero Gravity Corporation will take $1,167,291.58 from Amerijet International, Inc., less the $165,174.25 that it owes Amerijet, for a total of $1,002,117.33.

Signed on April 14, 2018, at Houston, Texas.

                                                  Lynn N. Hughes
                                        United States District Judge